887 F.2d 935
 56 Ed. Law Rep. 757, 17 Media L. Rep. 1065
 PLANNED PARENTHOOD OF SOUTHERN NEVADA, INC., Plaintiff-Appellant,
v.
CLARK COUNTY SCHOOL DISTRICT; Members of the Board of
School Trustees; individually and in their capacities as
Trustees of the Clark County School District: Lucille Lusk;
Dan Goldfarb; Patricia A. Bendorf; Virginia Brooks
Brewster; Donald R. Faiss; Robert Forbus; Shirley Holst;
Robert E. Wentz, individually and in his capacity as
Superintendent of Schools; and the following Principals:
Lanny R. Lund; A. Ray Morgan; Brian O. Fox; et al.,
Defendants-Appellees.
 No. 88-2659.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 10, 1989.
Decided Oct. 11, 1989.
 
 Roger K. Evans, Planned Parenthood Federation of America, New York City, for plaintiff-appellant.
 Thomas J. Moore, Las Vegas, Nev., for defendants-appellees.
 Appeal from the United States District Court for the District of Nevada.
 Before CHAMBERS, WALLACE and WIGGINS, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Planned Parenthood of Southern Nevada (Planned Parenthood) brought this action under 42 U.S.C. Sec. 1983 seeking declaratory and injunctive relief against the Clark County School District, members of its governing board, the superintendent of schools, and ten principals (collectively school district). Planned Parenthood charges that the school district's refusal to publish Planned Parenthood's advertisements in school-sponsored publications violates its right to freedom of expression guaranteed by the first amendment. Following a trial on stipulated facts, the district court ruled in favor of the school district. The district court had jurisdiction under 28 U.S.C. Secs. 1331 and 1343, and we have jurisdiction over this timely appeal pursuant to 28 U.S.C. Sec. 1291. Because we conclude that the publications are a nonpublic forum and the restrictions on Planned Parenthood's advertisements are reasonable, we affirm.
 
 
 2
 * Planned Parenthood is a not-for-profit corporation of the State of Nevada, and is an affiliate of Planned Parenthood Federation of America. Planned Parenthood conducts a family planning program that provides clinical, educational, and counseling services relating to reproductive health. The school district was created under Nevada law to control and supervise the education of all minor children within the public school district of Clark County, Nevada. The school district operates 15 high schools to which this action is limited.
 
 
 3
 The school district authorizes its high schools to publish newspapers, yearbooks, and athletic event programs. High school newspapers and yearbooks are published as part of the school district's curriculum. Newspapers are published as part of the Journalism I and Journalism II courses; yearbooks are published in Publications I and Publications II courses. These courses are taught by school district faculty members, and students receive grades and academic credit upon their completion. Athletic event programs are not published as part of any course curriculum.
 
 
 4
 The school district does not require its publications to contain advertising. Instead, it authorizes each of its high school principals to decide which publications at his or her school will accept advertising. The school district also grants high school principals discretion both to set guidelines for publishing advertising and to determine whether a proposed advertisement satisfies those guidelines. The school district's policy toward its publications is reflected in the following memorandum circulated to all high school principals by Daniel Hussey (Hussey memorandum):
 
 
 5
 A school has an important interest in avoiding the impression that it has endorsed a viewpoint at variance with its educational program. It is not at all unlikely that an advertisement may be viewed as school endorsement of its contents.
 
 
 6
 ....
 
 
 7
 If a school publication does accept advertising, some categories of advertising may be excluded. Drug paraphernalia, or alcohol beverages advertisements, for example, may be viewed as encouraging action which might endanger the health and welfare of students. Advertisements which are libelous, vulgar, racially offensive, factually inaccurate, or of poor production quality (misspelled words, grammatical errors, etc.) may be excluded. Advertisements having explicit sexual content or overtones may be excluded. The courts have allowed wide latitude in proscribing material which, though not obscene, because of its sexual content is deemed inappropriate for minors.
 
 
 8
 If advertising is allowed which promotes one side of a controversial issue, advertisements promoting the opposing side of a controversy should be similarly accepted.
 
 
 9
 The foregoing is not meant to be an exhaustive, all inclusive listing of categories of advertising which may be limited in school district publications. Furthermore, this memo is not directing or recommending that particular types of advertising be restricted. The purpose of this memo is to provide guidance to principals as to what power over advertising in [Clark County] publications they possess. How their power is used is within their discretion.
 
 
 10
 Also relevant to principals' evaluation of advertisements is Nev.Rev.Stat. Sec. 389.065, enacted by the Nevada legislature in 1979.[1] This statute regulates public education pertaining to the human reproductive system, related communicable diseases, and sexual responsibility. Pursuant to this statute, the school district enacted Policy 6123 and Regulation 6123, which largely tracked the statutory requirements. These provisions require, among other things, that sex education be taught only by a licensed teacher or school nurse.
 
 
 11
 At various times during 1984 and 1985, Planned Parenthood submitted advertisements to the high schools in the district for publication in their newspapers, yearbooks, and athletic programs. The advertisements read as follows:
 
 PLANNED PARENTHOOD
 
 12
 OF SOUTHERN NEVADA, INC.
 
 601 South Thirteenth Street
 Las Vegas, Nevada 89101
 Routine Gynecological Exams
 Birth Control Methods
 Pregnancy Testing & Verification
 Pregnancy Counseling & Referral
 
 13
 Most of the publications rejected the advertisements.
 
 
 14
 At the commencement of this lawsuit, ten high schools did not have their own written policies to regulate advertisements other than those originating from the school district; five high schools did have written regulations. The written guidelines of the high schools are substantially identical.[2] The guidelines provide that the individual high school reserves the right to deny advertising space to any entity that does not serve the best interests of the high school, the school district, and the community. A designated faculty member of the high school must approve all advertisements, and the high school will not accept lewd, vulgar, or obscene advertisements. The guidelines also proscribe the publication of advertisements for certain categories of products: X- or R-rated movies; gambling; alcoholic beverages; drug paraphernalia; and, significant to this action, birth control products and information.
 
 
 15
 Pursuant to the district court's pretrial order, the parties stipulated to the facts, waived the right to a further evidentiary hearing, and submitted the case for decision on the briefs. Relying in large part on San Diego Committee Against Registration and the Draft (CARD) v. Governing Board of Grossmont Union High School District, 790 F.2d 1471 (9th Cir.1986) (CARD ), the district court found that the school district's publications were limited public fora for advertisements lawfully available to high school age audiences; that, to the extent Planned Parenthood's advertisements were within the forum as thus defined, the school district would be required to publish the advertisements unless the school district could demonstrate a compelling governmental interest not to do so; and that the school district had demonstrated no such compelling interest. The court ordered the parties to confer and agree as to acceptable advertisements, or to submit to the court further evidence by which it could decide on the text of advertisements.
 
 
 16
 Before the district court took further action, the Supreme Court decided Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (Hazelwood ). On the basis of Hazelwood, the district court issued a second order finding that the school district's publications were nonpublic fora and that the refusal to accept Planned Parenthood's advertisements was reasonable. The district court reasoned that Hazelwood vitiated the precedential value of the majority's analysis in CARD and validated the dissent's approach. The district court entered judgment in favor of the school district. This appeal followed.
 
 II
 
 17
 The issue presented is whether the school district violated the first amendment by refusing to publish in its school-sponsored publications the advertisements submitted by Planned Parenthood. The school district concedes that Planned Parenthood's advertisements are protected speech under the first amendment. This case does not require us to decide the extent, if any, Planned Parenthood's advertisements constitute commercial speech, which is accorded less protection than noncommercial speech. See Board of Trustees of the State University of New York v. Fox, --- U.S. ----, ---- - ----, 109 S.Ct. 3028, 3031-3035, 106 L.Ed.2d 388 (1989); Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico, 478 U.S. 328, 341, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986).
 
 
 18
 To resolve this appeal we must first identify the nature of the forum. See Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985) (Cornelius ). This inquiry presents a question of law which we review independently. See Hazelwood, 108 S.Ct. at 568-69; Cornelius, 473 U.S. at 802-06, 105 S.Ct. at 3448-51. Next, we must determine whether the school district's justifications for rejecting the advertisements satisfy the standards applicable to the relevant forum. See Cornelius, 473 U.S. at 797, 105 S.Ct. at 3446. This is also a question of law reviewed independently. See Hazelwood, 108 S.Ct. at 571-73. Though we would normally review the district court's findings of fact for clear error, id. 108 S.Ct. at 568, the parties' stipulation to the facts obviates such review.
 
 III
 
 19
 The Constitution does not require the government to open its property to all seeking an outlet for protected expression. Cornelius, 473 U.S. at 799-800, 105 S.Ct. at 3447-48.
 
 
 20
 Recognizing that the Government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated," the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes.
 
 
 21
 Id. at 800, 105 S.Ct. at 3448, quoting Greer v. Spock, 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976) (Greer ). Within this analysis, "the Court [has] identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449. In traditional and designated public fora, content-based restrictions on speech must be necessary to serve a compelling state interest and narrowly tailored to that end. Id. at 800, 105 S.Ct. at 3448; Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) (Perry ); Carey v. Brown, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1981). In nonpublic fora, on the other hand, restrictions on speech need only be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Perry, 460 U.S. at 46, 103 S.Ct. at 955; see also Cornelius, 473 U.S. at 800, 105 S.Ct. at 3448. This deferential review recognizes that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." United States Postal Service v. Council of Greenburgh Civic Associations, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981).
 
 
 22
 Traditional public fora are "streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " Perry, 460 U.S. at 45, 103 S.Ct. at 955, quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). Designated public fora are created when the government opens its property " 'for indiscriminate use by the general public,' or by some segment of the public." Hazelwood, 108 S.Ct. at 568, quoting Perry, 460 U.S. at 47, 103 S.Ct. at 956. The government may also designate a forum for a limited purpose such as use by certain speakers or the discussion of specific topics. Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449; Perry, 460 U.S. at 45-46 & n. 7, 103 S.Ct. at 954-55 & n. 7; see also Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (Widmar ) (university meeting places are designated public forum for use by student groups).
 
 
 23
 The issue before us is whether the school district designated the publications as public fora. To determine whether the government has created a designated public forum, we look to the government's intent. Hazelwood, 108 S.Ct. at 568; Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449; Perry, 460 U.S. at 47, 103 S.Ct. at 956. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449 (emphasis added). The government must be "motivated by an affirmative desire to provide an open forum." Id. at 805, 105 S.Ct. at 3450. We will not presume the government has converted a nonpublic forum into a designated public forum unless, "by policy or by practice," Perry, 460 U.S. at 47, 103 S.Ct. at 956, the government has demonstrated a "clear intent" to do so. Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449. "If the facilities have instead been reserved for other intended purposes, 'communicative or otherwise,' then no public forum has been created." Hazelwood, 108 S.Ct. at 568, quoting Perry, 460 U.S. at 46, 103 S.Ct. at 955. Finally, "where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum." Cornelius, 473 U.S. at 804, 105 S.Ct. at 3450, citing Greer, 424 U.S. at 828, 96 S.Ct. at 1213 (military base not a public forum), and Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (Adderley ) (jailhouse not a public forum).
 
 
 24
 In Hazelwood, the Court determined that a high school newspaper was not a designated public forum. The Court began its analysis by recognizing the unique characteristics of the school environment. A school, the Court explained, "need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school." 108 S.Ct. at 567, quoting Bethel School District No. 403 v. Fraser, 478 U.S. 675, 685, 106 S.Ct. 3159, 3165, 92 L.Ed.2d 549 (1986) (Fraser ). A school is "entitled to 'disassociate itself' from [ ] speech ... 'wholly inconsistent with the "fundamental values" of public school education.' " Id., quoting Fraser, 478 U.S. at 685-86, 106 S.Ct. at 3165-66. The Court observed that school boards, not federal courts, should determine " 'what manner of speech in the classroom or in school assembly is inappropriate.' " Id., quoting Fraser, 478 U.S. at 683, 106 S.Ct. at 3164.
 
 
 25
 With these characteristics in mind, the Court looked to numerous factors to determine the school's intent: the newspaper was published as part of the school's journalism course curriculum; the purpose of the newspaper was to impart journalistic skills to students; the course was taught by a faculty member during school hours; the students received grades and academic credit for the course; the school did not deviate in practice from its policy of publishing the newspaper as part of the education curriculum; and school officers reserved the authority to exercise and in fact did exercise editorial control over the content of the paper. Id. 108 S.Ct. at 568. The Court concluded that these factors did not show a " 'clear intent' " to open the school newspapers to " 'indiscriminate use.' " Id. at 569, quoting Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449, and Perry, 460 U.S. at 47, 103 S.Ct. at 956.
 
 
 26
 In Cornelius, the Court found that the government did not intend a federally sponsored charity fund drive to be a public forum. The Court reasoned that the government's consistent policy was to limit the fund drive to "appropriate" voluntary organizations and to require all organizations seeking participation to obtain permission from the government. The Court observed that the government had developed extensive admission criteria. Finally, the Court looked to the nature of the property. This property--the federal workplace--existed to accomplish work, not to provide a forum for public expression. Cornelius, 473 U.S. at 804-06, 105 S.Ct. at 3450-51.
 
 
 27
 Similarly, the Court in Perry found that a school district's internal mail system was not a public forum. Although the mail system had been used by numerous private organizations, such as local parochial schools, church groups, YMCAs, and Cub Scout units, Perry, 460 U.S. at 39 & n. 2, 103 S.Ct. at 952 & n. 2, the Court concluded that the practice of requiring permission from individual school principals before access to the system would be granted indicated an intent to maintain a nonpublic forum. Id. at 47, 103 S.Ct. at 956. Again, in Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (Lehman ), the government's long-observed practice of limited advertising space on public buses by requiring the management company to exercise control over the subject matter of such advertisements reflected an intent to keep the forum closed. Id. at 303-04, 94 S.Ct. at 2717-18. Thus, absent contrary intent, the government's nonpublic property will remain nonpublic.
 
 A.
 
 28
 We now turn to whether the school district's publications may be characterized as a public forum. Planned Parenthood concedes that these publications are not a traditional public forum. Rather, it argues that the school district has designated its publications as a forum for public expression.
 
 
 29
 As in Hazelwood, Planned Parenthood's constitutional claims arise in the context of school-sponsored publications. Hazelwood requires that we apply the first amendment " 'in light of the special characteristics of the school environment.' " 108 S.Ct. at 567, quoting Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). If a school "need not tolerate student speech that is inconsistent with its 'basic educational mission,' " id., quoting Fraser, 478 U.S. at 685, 106 S.Ct. at 3165, surely this must also be true for outside speech that is equally inconsistent. To fulfill its formidable responsibility of inculcating values to our youth, a school must be able to " 'disassociate itself' " from certain types of speech. Id., quoting Fraser, 478 U.S. at 685, 106 S.Ct. at 3165. We must be mindful that " 'nowhere [has the Supreme Court] suggested that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for ... unlimited expressive purposes.' " Perry, 460 U.S. at 44, 103 S.Ct. at 954, quoting Grayned v. City of Rockford, 408 U.S. 104, 117-18, 92 S.Ct. 2294, 2304-05, 33 L.Ed.2d 222 (1972).
 
 
 30
 We need not decide whether the school district's publications constitute several fora or one forum. The result will be the same under either approach.
 
 1.
 
 31
 The school district's policy and practice regarding its newspapers and yearbooks is strikingly similar to that of the Hazelwood School Board analyzed by the Court in Hazelwood. See Hazelwood, 108 S.Ct. at 568-69. The school district's policy toward these publications is reflected in the Hussey memorandum circulated to all high school principals. It unequivocally reveals an intent to limit access to these publications. The policy invests principals with broad authority and discretion to control the content of advertisements appearing in these publications. The school district's purpose in publishing its newspapers and yearbooks is educational. These publications are produced as part of the school district's course curriculum. The courses are taught by school district faculty members, and students receive grades and academic credit for completing the courses. Furthermore, there is no evidence that the school district has ever deviated from its policy of publishing newspapers and yearbooks as part of its curriculum. Rather, the school district has "reserved to itself the responsibility to regulate the conduct of the school newspaper in accordance with its perception of the proper function of education." Burch v. Barker, 861 F.2d 1149, 1158 (9th Cir.1988). We find nothing to indicate that the school district, "by policy or by practice," Perry, 460 U.S. at 47, 103 S.Ct. at 956, demonstrated a "clear intent to create a public forum" with respect to its newspapers and yearbooks. Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449; see Hazelwood, 108 S.Ct. at 568-69.
 
 2.
 
 32
 The athletic event programs are not published as part of any course curriculum. Nonetheless, the school district's policy toward these publications is likewise reflected in the Hussey memorandum. The memorandum encompassed "school district publications," not merely yearbooks and newspapers. As we have already explained, the memorandum reveals an intent to limit access to its publications. Not only are principals free to reject advertising completely, they may also regulate the content of advertisements they choose to accept. Such a policy does not show "an affirmative desire to provide an open forum." Cornelius, 473 U.S. at 805, 105 S.Ct. at 3450.
 
 
 33
 The policy and practice of the individual principals is consistent with that of the school district. There is no evidence that any principal elected to surrender the authority to control the content of advertisements in programs. To the contrary, all principals have reserved the discretion both to establish guidelines and to determine whether a proposed advertisement satisfies those guidelines. The written guidelines promulgated by individual principals are in conformity with, and indeed augment, the policy articulated in the Hussey memorandum. As in Cornelius and Perry, those seeking to advertise must receive the permission of the principal. See id. 473 U.S. at 804, 105 S.Ct. at 3450 ("The Government's consistent policy has been to limit participation in the [fund drive] to 'appropriate' voluntary agencies and to require agencies seeking admission to obtain permission from federal and local Campaign officials."); Perry, 460 U.S. at 47, 103 S.Ct. at 956 ("Permission to use the system to communicate with teachers must be secured from the individual building principal."). The district court did not find nor is there any evidence that granting permission is a mere formality. See Cornelius, 473 U.S. at 804, 105 S.Ct. at 3450; Perry, 460 U.S. at 47, 103 S.Ct. at 956. The policy and practice of the principals fails to demonstrate a "clear intent" to provide "indiscriminate use" to the public. See Hazelwood, 108 S.Ct. at 569; Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449; Perry, 460 U.S. at 47, 103 S.Ct. at 956.
 
 
 34
 An examination of the nature of the athletic programs further supports our conclusion. See Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449 ("The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent."). The school district publishes programs as a service to spectators of school-sponsored athletic contests. The programs provide useful information about the participating teams. High schools sell advertising to help defray the costs of offering this service. In contrast to the state university's meeting facilities at issue in Widmar, these programs do not possess many of the characteristics of a traditional public forum. See Widmar, 454 U.S. at 267 n. 5, 102 S.Ct. at 273 n. 5. They exist to dispense select school-related information, not to provide a forum for public expression. See Cornelius, 473 U.S. at 805, 105 S.Ct. at 3450. The school district therefore " 'has [the] power to preserve the property under its control for the use to which it is lawfully dedicated.' " Greer, 424 U.S. at 836, 96 S.Ct. at 1216, quoting Adderley, 385 U.S. at 47, 87 S.Ct. at 247.
 
 
 35
 Moreover, in examining the nature of the athletic event programs, we must not ignore the special characteristics of the school environment. See Cornelius, 473 U.S. at 801-02, 105 S.Ct. at 3448-49 (the Court's conclusion that the fund drive rather than the workplace constitutes the forum "does not mean, however, that the Court will ignore the special nature and function of the federal workplace in evaluating the limits that may be imposed on an organization's right to participate in the [forum]."); see also Perry, 460 U.S. at 44, 103 S.Ct. at 954. Though the programs are not part of the school district's curriculum, they are "disseminated under its auspices." Hazelwood, 108 S.Ct. at 570. These programs therefore play a role, however small, in the school's mission. Again, a school must be "entitled to 'disassociate itself' from speech" inconsistent with that mission. Id. at 567, quoting Fraser, 478 U.S. at 685, 106 S.Ct. at 3165. It is of no moment that the programs' purpose is extra-curricular; the schools' interest is the same. "The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order." Fraser, 478 U.S. at 683, 106 S.Ct. at 3164. Because indiscriminate expressive activity would disrupt this process, id., we are to be "particularly reluctant" to impute to the school an intent to create a public forum. Cornelius, 470 U.S. at 804, 105 S.Ct. at 3450, citing Greer, 424 U.S. at 828, 96 S.Ct. at 1213, and Adderley, 385 U.S. at 39, 87 S.Ct. at 243. We thus conclude that the athletic event programs are a nonpublic forum.
 
 3.
 
 36
 Planned Parenthood argues that the only advertisements rejected were those it submitted. No such explicit finding was made by the district court. However, such a finding would not be determinative of the issue. In Perry, individual principals permitted numerous private groups to use the school's internal mail system. The record did not indicate whether any requests for use had been denied, nor did it reveal whether permission had to be sought separately for every message that a group wished to deliver to the teachers. Perry, 460 U.S. at 39 & n. 2, 103 S.Ct. at 951 & n. 2. The Court nevertheless found that "[t]his type of selective access does not transform government property into a public forum." Id. at 47, 103 S.Ct. at 956. The Court reasoned that the school, by requiring those seeking to use the mail system to obtain permission, had not opened its system "for indiscriminate use by the general public." Id. Here, principals may grant selective access to certain groups to advertise in the publications. Indeed, some principals have even accepted Planned Parenthood's advertisements. Perry teaches that this practice does not create an open forum. Id.; see also Greer, 424 U.S. at 838 n. 10, 96 S.Ct. at 1217 n. 10 ("The fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix ... surely did not leave the authorities powerless thereafter to prevent any civilian from entering Fort Dix to speak on any subject whatever."). The mere fact that some schools accepted Planned Parenthood's advertisements does not convert the publications into a public forum. The Court's forum framework does not require the government either to regulate with blanket uniformity all seeking to use its nonpublic property or to lose its right to regulate at all. Rather, we look to the government's intent. Permitting selective access does not establish an intent to open a nonpublic forum. The principals' consistent policy and practice has been to reserve control over the content of advertisements. We find no evidence of a "clear intent" to open the publications, including athletic event programs, to the public for "indiscriminate use." Perry, 460 U.S. at 47, 103 S.Ct. at 956.
 
 
 37
 Planned Parenthood also argues that the mere act of soliciting and accepting advertisements from entities outside of the school reveals an intent to create a public forum. This argument was squarely rejected by the Court in Lehman. There, the city sold advertising space on public transit vehicles. The city accepted advertisements from "cigarette companies, banks, savings and loan associations, liquor companies, retail and service establishments, churches, and civic and public-service oriented groups." Lehman, 418 U.S. at 300, 94 S.Ct. at 2715 (footnote omitted). Consistent with its long-standing policy, the city rejected petitioner's political advertisement. The Court held the city did not intend to create a public forum through mere acceptance of outside advertising on its property. Writing for the plurality, Justice Blackmun explained:
 
 
 38
 In these circumstances, the managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation. Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require.
 
 
 39
 Id. at 304, 94 S.Ct. at 2717. The school district's intent is no different than that of the city in Lehman: both sought to control the content of advertisements on their property. As Planned Parenthood would have it, the school district must either accept advertisements from no outside entity or accept them from every outside entity--or at least those peddling wares that are not illegal. Lehman ensures that the school district is not required to make such a choice.
 
 B.
 
 40
 Planned Parenthood argues that our decision in CARD requires us to find that the school district's publications are a designated public forum. The district court initially agreed, but concluded, after the Court's opinion in Hazelwood, that the majority position in CARD had been overruled.
 
 
 41
 In CARD, an organization involved in counseling young men on alternatives to compulsory military service (CARD) sought unsuccessfully to advertise in five Grossmont Union High School District (Board) student newspapers. CARD then sued the Board under section 1983, alleging that the Board's refusal to publish CARD's advertisements in its school-sponsored newspapers violated the first amendment. CARD argued that because the Board accepted various military recruitment advertisements, it had created a designated public forum. 790 F.2d at 1472-73.
 
 
 42
 The majority in CARD concluded that the Board's publications were a designated public forum. Id. at 1476. The majority rested its finding on three factors. First, it observed that "[n]ewspapers, including the Board's, are devoted entirely to expressive activity." Id. Second, the majority stated that "the admitted policy and practice of the Board is to allow a particular group--the students--to discuss any topic in the newspapers, subject only to certain conditions not relevant to the issues before us." Id. Finally, the majority stated that "[t]he Board's admitted policy and practice is to allow members of the general public to avail themselves of the forum as long as their speech consists of advertisements offering goods, services, or vocational opportunities to students." Id.
 
 
 43
 We agree with the district court that the CARD majority's analysis cannot be harmonized with that of the Supreme Court in Hazelwood. The CARD majority did not apply the first amendment in light of the special characteristics of the school environment, as directed by Hazelwood. 108 S.Ct. at 567. CARD is void of reference to the school's unique role. More important, absent from the CARD majority's discussion is any mention, much less analysis, of the Board's intent. Under Hazelwood, intent is central to the categorization of the forum. Id. 108 S.Ct. at 568-69. Thus, the CARD majority is silent as to whether the Board's purpose in publishing its newspapers was educational; whether the faculty exercised editorial control over the contents of advertisements published in its newspapers; whether the Board produced the newspapers as part of its curriculum; whether faculty members supervised the newspapers' publication; and whether students received grades and academic credit for publishing the newspapers. Compare CARD, 790 F.2d at 1476, with Hazelwood, 108 S.Ct. at 568. In other words, the CARD majority made no inquiry whether the Board " 'reserve[d] the forum for its intended purpos[e].' " Hazelwood, 108 S.Ct. at 569, quoting Perry, 460 U.S. at 46, 103 S.Ct. at 955.
 
 
 44
 The divergence of the CARD majority's analysis from that of Hazelwood is particularly visible in its discussion of the first factor on which it relied--that all newspapers are entirely devoted to expressive speech. The majority reasoned that "[e]verything that appears in a newspaper is speech, whether commercial, political, artistic, or some other type. It is difficult to think of any other kind of property that is more compatible with expressive activity." CARD, 790 F.2d at 1476. In contrast, the Court in Hazelwood did not engage in generalities about the nature of all newspapers circulated to the public. Rather, the Court focused its analysis on the special characteristics of the particular school-sponsored newspaper in that case and the intent of the school in publishing it. Hazelwood, 108 S.Ct. at 567-69. We therefore conclude that Hazelwood prohibits us from relying on CARD in determining the nature of the forum.
 
 IV
 
 45
 The government may regulate speech in a nonpublic forum "in any reasonable manner." Hazelwood, 108 S.Ct. at 569; see also Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451; Perry, 460 U.S. at 46, 103 S.Ct. at 955. "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451. "It is only when the decision to censor a school-sponsored publication ... has no valid educational purpose that the First Amendment is so 'directly and sharply implicate[d]' as to require judicial intervention to protect ... constitutional rights." Hazelwood, 108 S.Ct. at 571 (footnote omitted), quoting Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).
 
 
 46
 In Hazelwood, the Court explained at length the reasonable restrictions a school may impose on school-sponsored speech:
 
 
 47
 Educators are entitled to exercise greater control over ... student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.... In addition, a school must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate student speech on potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting. The school must retain the authority to refuse ... to associate the school with any position other than neutrality on matters of political controversy.
 
 
 48
 Hazelwood, 108 S.Ct. at 570. Furthermore, restrictions on school-sponsored publications need not be pursuant to written regulations. Id. at 571 n. 6.
 
 
 49
 The school district declined to publish Planned Parenthood's advertisements on the grounds that the subject matter could be controversial. Principals testified that they were concerned that some parents and community members did not embrace Planned Parenthood's function of offering family planning services to teenagers. The principals therefore sought to maintain a position of neutrality on the subject. Furthermore, principals stated they did not wish to open their publications to entities offering some of the same products as Planned Parenthood, or to organizations having competing views. Finally, principals stated that they sought to remain well within the bounds of the Nevada state statute and the school's own policy and regulations regarding sex education. The common thread among all of these justifications is that the school district wished to steer clear of any distractions which could impede its educational mission.
 
 
 50
 We have little difficulty concluding that the school district's restrictions are reasonable. Hazelwood grants schools wide latitude in controlling the content of school-sponsored publications. The newspapers, yearbooks, and athletic event programs all "bear the imprimatur of the school." Hazelwood, 108 S.Ct. at 569. It is thus reasonable for the school district to attempt to ensure that the "views of the individual speaker are not erroneously attributed to the school." Id. at 570. It also may properly avoid "potentially sensitive topics," such as those related to "teenage sexual activity." Id. In addition, the school district has a legitimate interest in refusing "to associate the school with any position other than neutrality" on the subject of teenage family planning. Id. We cannot conclude that the restrictions had "no valid educational purpose." Id. at 571.
 
 
 51
 Planned Parenthood argues that the school district offered no proof that the proposed advertisements related to subjects that are indeed viewed as controversial or sensitive to parents and members of the community. Alternatively, Planned Parenthood argues that even if its advertisements are controversial, the school district made no showing that the contents of the advertisements would be attributable to the schools. The Supreme Court has explicitly rejected this line of argument. In Perry, the school's purposes in limiting access to its mail system was to avoid disruption of the educational environment. Perry, 460 U.S. at 52, 103 S.Ct. at 959. The court of appeals discounted this factor, reasoning that there was no evidence in the record of past disruptions stemming from general access to the system, nor was there proof that future disturbances were likely. Id. at 52 n. 12, 103 S.Ct. at 959 n. 12. Reversing the court of appeals, the Court explained that "[w]e have not required that such proof be presented to justify the denial of access to a nonpublic forum on grounds that the proposed use may disrupt the property's intended function." Id. Similarly, in Hazelwood, the Court did not require the school to prove that subjects excluded from its school-sponsored publication were indeed sensitive to the audience. Rather, the Court reasoned that the school "could reasonably have been concerned" about the effects of the restricted material. Hazelwood, 108 S.Ct. at 571. Here, the school district "could reasonably have been concerned" that Planned Parenthood's advertisement would distract from its mission. No further proof is required. We therefore find Planned Parenthood's argument unpersuasive.
 
 V
 
 52
 Control over access to a nonpublic forum must be viewpoint neutral. Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451; Perry, 460 U.S. at 49, 103 S.Ct. at 957. Planned Parenthood concedes that the record does not show that the school district engaged in viewpoint discrimination. Because the publications are a nonpublic forum and the restrictions of Planned Parenthood's advertisements are reasonable, we find no violation of the first amendment.
 
 
 53
 AFFIRMED.
 
 
 
 [1]
 Nev.Rev.Stat. Sec. 389.065 states in part:
 
 
 [1]
 The board of trustees of a school district shall establish a course or unit of a course of:
 (a) Factual instruction concerning acquired immune deficiency syndrome; and
 (b) Instruction on the human reproductive system, related communicable diseases and sexual responsibility.
 ....
 
 
 [3]
 The subjects of the courses may be taught only by a teacher or school nurse whose qualifications have been previously approved by the board of trustees
 
 
 [2]
 The following is typical of the guidelines promulgated by the high schools:
 CHAPARRAL HIGH SCHOOL ADVERTISING REGULATIONS
 
 
 [1]
 Chaparral High School reserves the right to deny advertising space to any business and/or individual who does not serve the best interests of Chaparral High School, The Clark County School District, and the Las Vegas community
 
 
 [2]
 The deadline for all ads ready for print is five (5) days prior to publication. The deadline for ads to be made by the Chaparral Express is eight (8) days prior to publication. Any exception to these deadlines must be made with the printer
 
 
 [3]
 The Chaparral Express and Vaquero (yearbook) will not sell ad space over 30% of the edition's total copy
 
 
 [4]
 Chaparral High School cannot be held responsible for fraudulent ads run in good faith. Legal responsibility lies with the advertiser
 
 
 [5]
 Chaparral High School will not run any ad that, in the opinion of the staff and/or administration, is lewd, vulgar, or obscene
 
 
 [6]
 Chaparral High School will not accept ads for the following products:
 a. X- or R-rated movies
 b. Gambling aids
 c. Tobacco products
 d. Liquor products
 e. Birth control products or information
 f. Drug paraphernalia
 g. Pornography
 
 
 [7]
 All advertising must be approved by the supervising administrator prior to going to print