941 F.2d 817
 60 USLW 2136, 69 Ed. Law Rep. 252
 PLANNED PARENTHOOD OF SOUTHERN NEVADA, INC., Plaintiff-Appellant,
v.
CLARK COUNTY SCHOOL DISTRICT, Members of the Board of School
Trustees, individually and in their capacity as Trustees of
the Clark County School District: Lucille Lusk, Dan
Goldfarb, Patricia Bendorf, Virginia Brooks Brewster, Donald
R. Faiss, Robert Forbuss, and Shirley Holst; Robert Wentz,
individually and in his capacity as Superintendent of
Schools; and the following principals: Lanny R. Lund; A.
Ray Morgan; Brian O. Fox, et al., Defendants-Appellees.
 No. 88-2659.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 18, 1990.
Decided Aug. 5, 1991.
 
 Roger K. Evans, Planned Parenthood Federation of America, New York City, Mark Brandenburg, Las Vegas, Nev., for plaintiff-appellant.
 Thomas J. Moore, Las Vegas, Nev., for defendants-appellees.
 Appeal from the United States District Court for the District of Nevada.
 Before WALLACE, Chief Judge, CHAMBERS, GOODWIN, HUG, PREGERSON, ALARCON, POOLE, NORRIS, WIGGINS, FERNANDEZ and RYMER, Circuit Judges.
 RYMER, Circuit Judge:
 
 
 1
 This case raises the same concern addressed by the United States Supreme Court in Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988): the extent to which educators may exercise editorial control over the contents of high school publications.
 
 
 2
 In Hazelwood, a high school principal declined to publish two student articles which he believed were inappropriate in a school-sponsored newspaper. The Court held that when school facilities, such as publications, have been reserved for intended educational purposes, school officials may regulate their contents in any reasonable manner; that a school, in its capacity as publisher, has authority to refuse to associate the school with any position other than neutrality on matters of political controversy; and that it was reasonable for a high school principal to control student expressive activities that he concluded were unsuitable for publication on account of their subject matter, given the youth of the audience, and lack of opportunity for third-parties to respond.
 
 
 3
 In this case, high school educators who permit advertisements in school-sponsored publications declined to accept advertisements for the services of Planned Parenthood in student newspapers, yearbooks and athletic programs. The schools believed publishing the advertisements might implicate their classes on sex education and put the school's imprimatur on one side of a controversial issue. The district court concluded that this is a Hazelwood case, and we agree.
 
 
 4
 Because both are school cases and the publications are school-sponsored, we do not write on a clean slate. Hazelwood instructs that we are to invest high school educators with greater control over expressive activities that bear the school's imprimatur than other forms of speech or use of government facilities. Thus, in striking a balance between the schools' interests and Planned Parenthood's, we must assume that school-sponsored publications are nonpublic and that unless the schools affirmatively intend to open a forum for indiscriminate use, restrictions reasonably related to the school's mission that are imposed on the content of school-sponsored publications do not violate the first amendment.
 
 
 5
 This case raises troubling issues because few things are so fundamental as our right to speak out, student or adult, pharmacist or Planned Parenthood. It is the more so because few things are so significant to our society, or reflect such deeply held and widely divergent views crying out for expression, as family planning, sex education, birth control and teenage pregnancy.
 
 
 6
 Yet "the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not of federal judges." Hazelwood, 484 U.S. at 273, 108 S.Ct. at 571. We are not educators and curricular choices are not ours to make. We are not members of the Board of Education and it is not open to us as judges to decide this case as we might vote were we politicians. Our task is not to decide whether the message, or the messenger, is a menace or the messiah.
 
 
 7
 Rather, we must start with Hazelwood and the questions we must decide are these:
 
 
 8
 Are the publications in which Planned Parenthood wishes to advertise forums for public expression?
 
 
 9
 Do these school-sponsored publications bear the imprimatur of the school, such that they are within the intended purpose for which the forum is reserved?
 
 
 10
 Were school officials justified in refusing to accept the Planned Parenthood advertisement?
 
 
 11
 Before Hazelwood the district court found Planned Parenthood's first amendment rights were infringed. In light of Hazelwood it reconsidered and changed its ruling. In this it acted correctly, and we affirm.
 
 
 12
 * Planned Parenthood of Southern Nevada (Planned Parenthood) brought suit under 42 U.S.C. § 1983 against the Clark County School District (school district) seeking declaratory and injunctive relief for an alleged deprivation of its first amendment rights. Planned Parenthood claims the school district violated its rights under the first and fourteenth Amendments by refusing to accept advertisements it submitted for publication in high school newspapers, yearbooks and athletic programs.
 
 
 13
 Planned Parenthood, a nonprofit corporation affiliated with Planned Parenthood Federation of America, is a family planning program that provides clinical, educational and counseling services for matters relating to reproductive health. The Clark County School District is a local school district, comprised of fifteen high schools, created under Nevada law to control and supervise the education of all minor children within the district.
 
 
 14
 The school district authorizes its high schools to publish newspapers, yearbooks and athletic programs. Newspapers and yearbooks are published as part of the school district curriculum. Newspapers are produced as part of Journalism I and II, while yearbooks are published in Publications I and II. These courses are taught by district faculty, and students receive grades and credit. Athletic programs are not produced as part of any particular course, but are distributed by the schools at school-sponsored events to inform spectators about the competition.
 
 
 15
 Principals are allowed to decide whether to accept advertising for these publications, to establish guidelines regulating acceptable advertisements and to determine whether a proposed advertisement satisfies the guidelines, if any. All of the schools but one accept advertising.
 
 
 16
 The school district's policy with respect to advertising is reflected in a memorandum from Daniel Hussey.[1] At the time of the suit, five schools had adopted written guidelines; eight promulgated them after the suit was begun, and two remain without guidelines. The guidelines typically provide that the school reserves the right to deny advertising space to any entity that does not serve the best interests of the school, the school district and the community. A faculty member, usually the principal, must approve all advertisements prior to publication. In addition to declaring that the school will not run any ads it deems lewd, obscene or vulgar, the guidelines note that advertisements for certain products will not be accepted: X- or R-rated movies, gambling aids, tobacco products, liquor products, birth control products or information, drug paraphernalia and pornography.
 
 
 17
 The school district also has enacted regulations dealing with "controversial issues," which provide in part, "No group or individual may claim the right to present arguments for or against any issue under study directly to students or to the class without authorization." Clark County School District Regulation 6124.2. Further, by statute, Nevada regulates instruction in the human reproductive system, related communicable diseases and sexual responsibility. Nev.Rev.Stat. § 389.065 (1987). Pursuant to this statute, the school district adopted Regulation 6123 which requires that sex education only be taught by qualified teachers and nurses, using only certain approved materials.
 
 
 18
 On numerous occasions between March 1984 and August 1985, Planned Parenthood submitted advertisements for publication in school district newspapers and athletic programs. The record does not show that Planned Parenthood submitted its advertisements to any yearbooks prior to commencing this suit. Each ad offered routine gynecological exams, birth control methods, pregnancy testing and verification, and pregnancy counseling and referral.[2] Most schools rejected the ad; one school continues to publish it.
 
 
 19
 Following trial on stipulated facts, the district court concluded that under San Diego Committee Against Registration and the Draft (CARD) v. Governing Board of Grossmont Union High School District, 790 F.2d 1471 (9th Cir.1986),[3] the publications were limited public forums for advertisements lawfully available to high school audiences, and that without showing a compelling government interest, the school district would have to publish Planned Parenthood's advertisements to the extent they fell within the forum created. When the Supreme Court thereafter decided Hazelwood, the district court withdrew its order and on reconsideration found that the publications were nonpublic forums and the exclusions reasonable. Planned Parenthood appealed the district court's judgment in favor of the school district. The panel affirmed, Planned Parenthood v. Clark County School District, 887 F.2d 935 (9th Cir.1989), and we took the matter en banc.
 
 II
 
 20
 The parties agree that Planned Parenthood's advertisements are protected speech under the first amendment. Therefore we must first resolve whether the school newspapers, yearbooks and athletic programs are forums for public expression. Hazelwood, 484 U.S. at 267, 108 S.Ct. at 567 ("We deal first with the question whether Spectrum may appropriately be characterized as a forum for public expression"); Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985).A
 
 
 21
 Planned Parenthood seeks access to advertising space in school-sponsored publications.[4] Hazelwood teaches that "school facilities may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public,' Perry Education Ass'n. v. Perry Local Educators' Ass'n., 460 U.S. 37, 47, 103 S.Ct. 948, 956, 74 L.Ed.2d 794 (1983), or by some segment of the public, such as student organizations." 484 U.S. at 267, 108 S.Ct. at 567. If, on the other hand, school facilities have been reserved for other intended purposes, "communicative or otherwise," no public forum will have been created and reasonable restrictions on speech may be imposed.[5] Id.; Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 & n. 7, 103 S.Ct. 948, 955 & n. 7, 74 L.Ed.2d 794 (1983).
 
 
 22
 In Hazelwood, student staff members of the school newspaper, Spectrum, argued that their principal violated their first amendment rights when he deleted two pages from the paper prior to its publication.[6] After establishing that the first amendment claims must be considered "in light of the special characteristics of the school environment," 484 U.S. at 266, 108 S.Ct. at 567 (quoting Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969)),[7] the Court reiterated that " '[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board,' rather than with the federal courts." 484 U.S. at 267, 108 S.Ct. at 567 (quoting Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 683, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986)). It then stressed that the school's intent is the critical factor in the forum calculus. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Id. (quoting Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449).
 
 
 23
 In determining whether school officials evinced any intent to open the pages of Spectrum to indiscriminate use, the Court considered such factors as the paper was produced as part of the high school curriculum; students received grades and academic credit for completing the course, which a faculty member taught; the school did not deviate in practice from its policy of publishing the paper as part of the educational curriculum; the teacher exercised a great deal of control over the production and publication of the paper, and both he and the principal had to approve nearly every aspect of each issue, including its content. The Court also reviewed written policy statements of the school board and Spectrum. One school board policy provided, among other things, that "[s]chool sponsored student publications will not restrict free expression or diverse viewpoints within the rules of responsible journalism." Spectrum had also declared that the paper "accepts all rights implied by the first amendment" and noted that "[o]nly speech that 'materially and substantially interferes with the requirements of appropriate discipline' can be found unacceptable and therefore be prohibited."[8] Hazelwood, 484 U.S. at 269 & n. 2, 108 S.Ct. at 269 & n. 2.
 
 
 24
 The Court concluded that this evidence failed to demonstrate the "clear intent to create a public forum," id. at 270, 108 S.Ct. at 569 (quoting Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449), that was present in other public forum cases, referring to Widmar v. Vincent, 454 U.S. 263, 267, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981); City of Madison Joint School District v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 174 & n. 6, 97 S.Ct. 421, 426 & n. 6, 50 L.Ed.2d 376 (1976); and Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 555, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975).[9] School officials could therefore regulate the contents of the paper "in any reasonable manner." Hazelwood, 484 U.S. at 270, 108 S.Ct. at 569.
 
 
 25
 Looking to the factors in this case that the Court found significant in Hazelwood leads us to the same conclusion. The school district and its principals treated all publications similarly. Their intent is most clearly evidenced by written policies that explicitly reserve the right to control content. Their practices were not inconsistent with these policies. Pursuant to them, advertising in school-sponsored publications was subject to the same right of approval as articles in Spectrum. We therefore cannot conclude on the record in this case that the school district clearly intended to open its publications, including advertising space, for "indiscriminate use." Rather, like the school board in Hazelwood, the school district here showed an affirmative intent to retain editorial control and responsibility over all publications and advertising disseminated under the auspices of its schools.
 
 
 26
 The Hussey memorandum sets out district policy on what power principals were meant to have over advertising. It notes that newspapers and yearbooks are produced as part of the curriculum and that publications and journalism courses form an integral part of the school's educational program. It affirms that
 
 
 27
 [a] school has an important interest in avoiding the impression that it has endorsed a viewpoint at variance with its educational program. It is not at all unlikely that an advertisement may be viewed as school endorsement of its contents.
 
 
 28
 It states that there is no requirement that a high school publish either a paper or yearbook, or accept advertising, but that "[i]f a school publication does accept advertising, some categories of advertising may be excluded." Finally, it requires that if advertising is allowed which promotes one side of a controversial issue, advertisements promoting the opposite side must be accepted. In this way, the school district conferred on school principals broad authority and discretion to limit advertising which may not serve the best interests of the school or might create the impression that the school has endorsed a viewpoint at variance with its educational program.
 
 
 29
 Consistent with this general directive, individual schools established guidelines reflecting their intent to retain control over advertising in school-sponsored publications. In addition to delineating categories of advertisements that will not be accepted, the guidelines expressly "reserve[ ] the right to deny advertising space to any business and/or individual that does not serve the best interests" of the particular school. This complements the school board's policy concerning "controversial issues," requiring objective presentation of opposing points of view. Clark County School District Regulation 6124.2. Furthermore, just as the principal and teacher in Hazelwood had final approval over the contents of Spectrum, ultimate authority over what advertisements appear in school-sponsored publications rests with the principal or his assistant. The schools' consistent policy has been to limit advertising to subjects and entities that are in the best interests of the school and to require that those seeking to advertise obtain approval from the principal.
 
 
 30
 There is no evidence that advertisements in newspapers or yearbooks were accepted for any purpose other than to enable the school to raise revenue to finance the publications, and at the same time impart journalistic management skills to students.[10] Nor does the evidence suggest that the high schools were "motivated by an affirmative desire to provide an open forum" for advertising in athletic programs; the schools did not accept advertising for any purpose other than to help defray the costs of this service. Cornelius, 473 U.S. at 805, 105 S.Ct. at 3450. As put in Cornelius, where the Court held that the government could exclude legal defense and political advocacy organizations from participation in the Combined Federal Campaign because it had not been designated as a public forum, "[t]he Government did not create the CFC for purposes of providing a forum for expressive activity. That such activity occurs in the context of the forum created does not imply that the forum thereby becomes a public forum for First Amendment purposes." Id; Greer v. Spock, 424 U.S. 828, 838 n. 10, 96 S.Ct. 1211, 1217 n. 10, 47 L.Ed.2d 505 (1966).
 
 
 31
 Both Hazelwood and Cornelius instruct that we also examine the nature of the government property involved in determining whether the forum is public or nonpublic. Hazelwood, 484 U.S. at 266, 108 S.Ct. at 567; Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451; cf. Greer, 424 U.S. at 838, 96 S.Ct. at 1217 ("[T]he business of a military installation [is] to train soldiers, not to provide a public forum"). High schools foster learning experiences inside and outside the classroom and serve pedagogical as well as in locus parenti purposes. For this reason, educators have the right to control expressive activity that students, parents and other members of the public "might reasonably perceive to bear the imprimatur of the school." Hazelwood, 484 U.S. at 271, 108 S.Ct. at 570.
 
 
 32
 In light of the schools' policy in accepting advertising in school-sponsored publications, and their practice of retaining control and requiring prior approval, we conclude that the record fails to reveal the requisite "clear intent to create a public forum" Hazelwood requires. 484 U.S. at 270, 108 S.Ct. at 569. Therefore, these school-sponsored newspapers, yearbooks and athletic programs, including advertisements, are not public forums.
 
 B
 
 33
 Planned Parenthood argues that Hazelwood simply says that high school publications are not traditional public forums and that beyond that courts should follow the public forum analysis set out in Perry, 460 U.S. at 45-47, 103 S.Ct. at 954-56; Cornelius, 473 U.S. at 800-04, 105 S.Ct. at 3447-50, and our decision in CARD, 790 F.2d at 1474-76. It urges that the district court erred in concluding that under Hazelwood, the school district had "plenary control" over the contents of its high school publications. Planned Parenthood further submits that the school district in fact created a limited forum for public advertising of goods and services that are lawfully available to high school age audiences. In support, it points to the wide variety of advertising which has been received and published and contends that it may not be discriminatorily excluded from that forum.[11]
 
 
 34
 We agree that a high school may create a public forum or designate a forum for limited purposes.[12] Hazelwood does not say otherwise, but it does constrain the analysis by requiring that courts focus on unique attributes of the school environment and recognize broadly articulated purposes for which high school facilities may properly be reserved. 484 U.S. at 270-73, 108 S.Ct. at 569-71.[13] We also agree that this case differs from Hazelwood in that Planned Parenthood is an outside entity seeking to advertise in school publications, whereas Hazelwood concerned students who wanted to have their articles published. It is likewise true that the schools solicited and accepted an array of advertising, including some for casinos which Planned Parenthood suggests belie the district's concern for the propriety of material for a teenage audience,[14] and some for providers of health services to whom Planned Parenthood analogizes itself. Yet we believe these points misdirect the inquiry, which the Supreme Court has instead focused on the schools' intent. While relevant factors in evaluating intent, none compels a different result in this particular case.
 
 
 35
 The Court has often held that selective access to government property does not alone render it a public forum. For example, in Perry, even though many private groups not affiliated with the school had access to and used the internal school mail facilities, the mail system was not open for use by the general public, potential users of the system were required to secure permission from the individual principals and there was no indication that permission was granted as a matter of course. The Court concluded that the property remained a nonpublic forum subject to reasonable regulation. Perry, 460 U.S. at 47, 103 S.Ct. at 956. In Cornelius, the Government's consistent policy was to limit the Combined Federal Campaign to "appropriate" voluntary agencies and require agencies seeking admission to obtain permission from certain officials. Cornelius, 473 U.S. at 804, 105 S.Ct. at 3450. Again, the Court held that "[s]uch selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum." Id. at 805, 105 S.Ct. at 3450. Most recently, in United States v. Kokinda, 497 U.S. ----, 110 S.Ct. 3115, 3121, 111 L.Ed.2d 571 (1990) (plurality), four Justices concluded that a sidewalk leading from a parking lot to a post office was a nonpublic forum. The plurality noted that although "individuals or groups have been permitted to leaflet, speak, and picket on postal premises, ... a practice of allowing some speech activities on postal property do[es] not add up to the dedication of postal property to speech activities." Id.
 
 
 36
 As in Perry and Cornelius, school officials in this case require permission and approval prior to granting access to high school publications. Although Planned Parenthood contends that it was the only potential advertiser excluded from the publications, the record does not demonstrate that permission and approval to advertise are granted as a matter of course. We therefore find nothing in Perry or Cornelius to support a conclusion that allowing some outside organizations to advertise converts the school-sponsored publications into public forums.[15]
 
 
 37
 Nor do we believe that this case is controlled by CARD, as Planned Parenthood urges. In CARD, which we decided before the Court decided Hazelwood, we held a student newspaper, along with its advertising spaces, to be a limited public forum. CARD, a nonprofit organization involved in counseling young men on alternatives to military service, sought to advertise in several school papers. Despite the fact that the papers accepted military recruitment advertisements, the school district refused to publish the ad CARD submitted.
 
 
 38
 Because it believed that newspapers are devoted entirely to expressive activity, and the school board's admitted policy and practice was to allow the students to discuss any topic in the newspapers and allow non-students to avail themselves of the forum as long as their speech consisted of advertisements offering goods, services or vocational opportunities to students, the CARD majority believed the evidence indicated an intent to create a limited public forum. CARD, 790 F.2d at 1476. Accordingly, it concluded that the school district could not exclude the advertisement without demonstrating a compelling reason. Alternatively, the majority held that assuming the school board was correct in its assertion that the school newspapers were a nonpublic forum, the exclusion of the proffered advertisement was unreasonable and constituted impermissible viewpoint discrimination. Id. at 1478.[16]
 
 
 39
 Planned Parenthood maintains that the schools' solicitation of advertisements from outside entities puts this case squarely within CARD rather than Hazelwood, which Planned Parenthood characterizes as applying only to student expression. We are not persuaded by Planned Parenthood's argument that the nature of the speech at issue here, advertisements from an outside entity rather than student speech, places this case beyond the reach of Hazelwood. Although the facts of Hazelwood dealt with student expression, its rationale was not so limited. The Court specifically spoke in terms of "school-sponsored publications, theatrical productions, and other expressive activities," 484 U.S. at 271, 108 S.Ct. at 570, and remarked on a school's ability to regulate reasonably the speech not only of students, but also "teachers, and other members of the school community." Id. at 269, 108 S.Ct. at 569. The publication is the same and the audience is the same, whether the source for the speech is from inside the school or outside, or is paid or free. The school has the same pedagogical concerns, such as respecting audience maturity, disassociating itself from speech inconsistent with its educational mission and avoiding the appearance of endorsing views, no matter who the speaker is.
 
 
 40
 Nor is there any reason to believe the Hazelwood Court would have drawn a line in the paper where Planned Parenthood suggests, for otherwise the students whose articles on pregnancy and parenting were not printed could have had an outside party buy space for an advertisement to print what they wrote. In this respect there is no principled distinction between students' constitutional rights and those of Planned Parenthood to access to school-sponsored publications. We therefore believe the Court intended that the same principles that animate educational decisions regarding the content of articles in school-sponsored publications come into play when determining what advertisements are suitable for publication in school newspapers, yearbooks and athletic programs.[17]
 
 
 41
 Although each public forum case is unique on its facts, and CARD is distinguishable on that basis,[18] its forum analysis was adopted without the benefit of Hazelwood's application of the public forum doctrine to high school-sponsored publications. To the extent our opinion in CARD did not give weight to the same considerations emphasized by Hazelwood, we can no longer rely on its analysis in determining the nature of the forum.[19] Rather it is the Supreme Court's decision in Hazelwood and not our prior decision in CARD that provides the appropriate frame of reference. Under Hazelwood, in cases such as this where school facilities have not intentionally been opened to indiscriminate expressive use by the public or some segment of the public, school officials retain the authority reasonably to refuse to lend the schools' name and resources to speech disseminated under school auspices.
 
 III
 
 42
 The Court in Hazelwood made a number of important statements about the nature of a high school's mission. Its discussion on the measure of school officials' authority over school-sponsored publications informs our analysis of both the nature of the government property involved and the justification for the restrictions imposed.
 
 
 43
 The Court drew a critical distinction between a school's obligation to "tolerate" particular "personal expression that happens to occur on the school premises," such as that addressed in Tinker, and "educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." Hazelwood, 484 U.S. at 270-71, 108 S.Ct. at 569-70.[20] When "school-sponsored" speech can fairly be characterized as part of the schools' mission, which the Court defined broadly, the first amendment affords educators "greater control" in deciding when the school will affirmatively "promote" or "lend its name and resources" to particular speech. Id. at 271-72, 108 S.Ct. at 570-71. The Court recognized that school authorities have legitimate educational interests in assuring that "participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." Id. at 271, 108 S.Ct. at 570. Moreover, the school must retain the authority to refuse to sponsor speech that might reasonably "associate the school with any position other than neutrality on matters of political controversy." Id. at 272, 108 S.Ct. at 570.
 
 
 44
 These characteristics help define what a school is about, and we must put the decision to exclude Planned Parenthood advertisements in that context. Thus, while a publisher is not normally viewed as endorsing the contents of paid advertisements, a high school stands in a different relationship with its public than the Las Vegas Review-Journal does to its. The Hussey memorandum, for example, notes the likelihood that readers may well impute endorsement of the contents of advertisements to a school. School-sponsored publications bear the name of the school. The newspapers and yearbooks are produced as part of the course curriculum, and the school directly distributes athletic programs at school events. School officials have editorial control over the contents of these publications and must specifically approve advertisements for publication. Accordingly, it is not at all unlikely that members of the public, parents of school children in particular, might reasonably perceive school-sponsored publications to "bear the imprimatur of the school" and associate the school in some way with the content of a particular advertisement.
 
 
 45
 A school's decision not to promote or sponsor speech that is unsuitable for immature audiences, or which might place it on one side of a controversial issue, is a judgment call which Hazelwood reposes in the discretion of school officials and which is afforded substantial deference.[21] We therefore conclude that controlling the content of school-sponsored publications so as to maintain the appearance of neutrality on a controversial issue is within the reserved mission of the Clark County School District.
 
 IV
 
 46
 Having concluded that the advertising pages in the school district's school-sponsored publications are nonpublic forums, we now consider whether the school's justification for refusing to publish Planned Parenthood's advertisement is reasonable. Hazelwood, 484 U.S. at 270, 108 S.Ct. at 569 (school authorities could regulate Spectrum "in any reasonable manner"). "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451; see also Perry, 460 U.S. at 49, 103 S.Ct. at 957 (right to make such distinctions are "implicit" in the concept of a nonpublic forum).
 
 
 47
 The schools' refusal to publish Planned Parenthood's advertisements was viewpoint neutral. Planned Parenthood's advertisements were rejected, and schools enacted guidelines excluding advertising that pertains to "birth control products and information," in order to maintain a position of neutrality on the sensitive and controversial issue of family planning and avoid being forced to open up their publications for advertisements on both sides of the "pro-life"-"pro-choice" debate. In addition to believing the copy and Planned Parenthood to be controversial, some principals felt that parents would object to the advertisement. The school district also viewed Planned Parenthood's advertisements as implicating its statutorily prescribed sex education curriculum and sought to avoid conflict with the state requirements regarding the manner sex education is presented to students.
 
 
 48
 When school facilities are not opened up as forums for public expression, Hazelwood recognizes the school's broad authority over school-sponsored speech. In light of the nature of the school environment, educators must have the ability to consider the "emotional maturity of the intended audience" as well as the authority to refuse to "associate the school with any position other than neutrality on matters of political controversy." Hazelwood, 484 U.S. at 272, 108 S.Ct. at 570; see also Cornelius, 473 U.S. at 809, 105 S.Ct. at 3452 ("avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum"). "Although the avoidance of controversy is not a valid ground for restricting speech in a public forum, a nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas." Cornelius, 473 U.S. at 811, 105 S.Ct. at 3453; cf. Lehman v. City of Shaker Heights, 418 U.S. 298, 304, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (plurality) ("the managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation").
 
 
 49
 We therefore agree with the district court that the school district's policy of not publishing advertisements that are "controversial, offensive to some groups of persons, that cause tension and anxiety between teachers and parents, and between competing groups such as [Planned Parenthood] and pro-life forces" is a reasonable one.[22] Because of the possible perception of sponsorship and endorsement, schools within the district could choose to maintain a position of neutrality on a matter of political controversy and not lend their name and resources to Planned Parenthood's advertisements.[23]
 
 
 50
 Related to the school district's intent to maintain a position of neutrality on controversial issues is its desire to avoid being forced to open up school publications to organizations having views competing with those of Planned Parenthood, should it be required to publish the proffered advertisements. In Perry, for example, the Court commented that the school district's policy of excluding a rival union from internal mail facilities prevented the system from becoming a battlefield for inter-union squabbles. Perry, 460 U.S. at 52, 103 S.Ct. at 959. Similarly, exclusion of Planned Parenthood's advertisements serves the goal of preserving the schools' editorial control over school-sponsored publications and preventing the advertising sections of those publications from becoming a forum for debate on family planning. The school district and individual school principals could reasonably choose to have the family planning debate take place in the classroom rather than in the advertising pages of its school-sponsored publications.
 
 IV
 
 51
 We conclude that the Clark County school-sponsored publications, including advertising spaces, are nonpublic forums. The decision to feature advertising in newspapers, yearbooks and athletic programs does not indicate the clear intent to abdicate editorial control over their contents and create a forum for advertisers of lawful goods and services. These schools retained the right to disapprove of advertisements that might carry a school-sponsored message to readers of its publications and put their imprimatur on one side of a controversial issue. Because their decision to limit access, whether wise or unwise, is reasonable and not an effort at viewpoint discrimination, the school district did not violate the first amendment in declining to publish Planned Parenthood's advertisements.
 
 
 52
 AFFIRMED.
 
 
 53
 WALLACE, Circuit Judge, with whom Circuit Judge CHAMBERS joins, concurring:
 
 
 54
 My opinion on behalf of the original panel affirmed the district court in reliance upon Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). See Planned Parenthood of Southern Nevada v. Clark County School District, 887 F.2d 935 (9th Cir.1989). Judge Rymer's opinion analyzes the same issues and reaches the same outcome. I concur for the reasons stated in the original panel opinion.
 
 CHAMBERS, Circuit Judge, concurring:
 
 55
 I concur in Judge Rymer's opinion and Chief Judge Wallace's concurrence.
 
 
 56
 NORRIS, Circuit Judge, with whom HUG, PREGERSON, and POOLE, Circuit Judges, join, dissenting:
 
 
 57
 This First Amendment dispute arises out of the Clark County School District's decision to engage in the business of selling advertising space to the public. Intent on making money to defray the production costs of their newspapers, yearbooks and athletic programs, school officials sold space to every advertiser that came along. Except one--Planned Parenthood.
 
 
 58
 Unlike the medley of ads the school district ran from casinos, bars, churches, political candidates and the United States Army, Planned Parenthood's ad, it decided, was unacceptable. Planned Parenthood's ad was not rejected because it was somehow inappropriate for high school students. Rather, school officials say, it was "controversial." Excerpt of Record ("ER") 57 at 11-15. The ad read as follows:
 
 
 59
 PLANNED PARENTHOOD OF SOUTHERN NEVADA, INC.
 
 601 SOUTH THIRTEENTH STREET
 LAS VEGAS, NEVADA 89101
 Routing Gynecological Exams
 Birth Control Methods
 Pregnancy Testing & Verification
 Pregnancy Counseling & Referral
 
 60
 The fact that "avoidance of controversy" is the sole[1] rationale available to the school district to justify its rejection of Planned Parenthood's ad is critical. It draws the battleline between majority and dissent, for we cross swords over a fundamental question: whether the school district created a limited public forum in the advertising space, thereby triggering strict scrutiny, or a nonpublic forum, requiring only reasonableness review. If, as the majority holds, the advertising space is a nonpublic forum, then, under a standard of reasonableness, "avoidance of controversy" may arguably qualify as a sufficient governmental interest to justify its suppression of Planned Parenthood's ad. If, however, as I contend, the advertising space is a limited public forum, then, under strict scrutiny, the school district's only available rationale falls dead in the water. As the Supreme Court has made clear, "avoidance of controversy is not a valid ground for restricting speech in a public forum...." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 811, 105 S.Ct. 3439, 3453, 87 L.Ed.2d 567 (1985).
 
 
 61
 The majority's decision to characterize the advertising space as nonpublic, and apply only reasonableness review, stems from a fundamental misunderstanding of the Court's public forum test.
 
 
 62
 The majority assumes that government officials may create a nonpublic forum and escape strict scrutiny merely by declaring their intent to control content as they see fit. So long as government reserves for itself broad, better yet, unbridled, discretion to censor expression, then it will be deemed to have intended to create a nonpublic forum, and its content-based exclusions will escape strict scrutiny. This so-called public forum test, which finds dispositive whatever officials say the scope of their censorship authority is, has the perverse effect of limiting judicial scrutiny of exactly the discriminatory, content-based exclusions most suspect under the First Amendment. The Supreme Court has never adopted--and, in fact, has explicitly rejected--this public forum test, even in the context of public schools.
 
 
 63
 Although the majority claims that its version of the Court's public forum test emanates from, and is consistent with, Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), it directly contravenes the test applied in Hazelwood and the Court's other public forum cases. Indeed, the majority so grossly misreads and misapplies Hazelwood that it turns Hazelwood into a peculiar anomaly, isolated from, and in conflict with, the rest of the Court's public forum cases. When, however, Hazelwood and the Court's other public forum cases are read carefully--and in harmony with each other--it becomes clear that the majority's public forum test turns fundamental First Amendment principles on their head.
 
 
 64
 My dissent is divided into five parts. In Part I, I discuss the relevant Supreme Court cases and apply their public forum test in deciding whether the school district created a limited public forum when it engaged in the business of selling advertising space to the public. In Parts II and III, I critique the majority's public forum test. In Part IV, I apply strict scrutiny in reviewing the decision of the school district to reject Planned Parenthood's ad. Part V is a conclusion.
 
 
 65
 * The Supreme Court does not license us, as the majority assumes, to determine the applicable level of scrutiny based merely on whether officials declare their intent to control content.[2] Rather, the applicable level of scrutiny depends on the risk that government is restricting expression based on its subject matter or viewpoint. This correlation between the level of scrutiny and the attendant risk of government censorship reflects the broader, anti-discrimination principle enshrined in the First Amendment: government may not favor or discriminate against expression because of its content. For " '[i]f there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.' " United States v. Eichman, --- U.S. ----, 110 S.Ct. 2404, 2410, 110 L.Ed.2d 287 (1990) (quoting Texas v. Johnson, 491 U.S. 397, 414, 109 S.Ct. 2533, 2544, 105 L.Ed.2d 342 (1989)).[3]
 
 
 66
 As a means of assessing the risk of government censorship, and thus, the applicable level of scrutiny, the Court focuses on the degree to which government, in policy or practice, opens its facilities to the public. See Hazelwood, 484 U.S. at 267-70, 108 S.Ct. at 567-69; Cornelius, 473 U.S. at 804-06, 105 S.Ct. at 3450-51; Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46-48, 103 S.Ct. 948, 955-56, 74 L.Ed.2d 794 (1983); Widmar v. Vincent, 454 U.S. 263, 267-68, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981); Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 555, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975).
 
 
 67
 In Cornelius, Perry and Hazelwood, government reserved its forum for a specific, lawful purpose, and then excluded only expression incompatible with that purpose, thereby reducing the risk that it was suppressing expression because of its subject matter or viewpoint. In each case, by circumscribing its discretion in this fashion, government manifested its intent to create a nonpublic forum, and the Court reviewed its exclusions only for reasonableness.
 
 
 68
 Conversely, the risk of viewpoint or subject matter discrimination--and the concomitant need for heightened review--increased in Southeastern Promotions and Widmar because government opened up its facilities indiscriminately with no specific purpose that narrowed its discretion to engage in content control. In opening its facilities so generally, government manifested its intent to create a limited public forum, and the Court reviewed its exclusions under heightened scrutiny.[4]
 
 
 69
 In Cornelius, the Court characterized an annual charitable fundraising drive in the federal workplace as nonpublic largely because the government had restricted access to tax-exempt, nonprofit providers of "direct health and welfare services to individuals...." 473 U.S. at 792, 105 S.Ct. at 3444. The government thus reserved the drive for a narrow purpose and then excluded political advocacy groups whose competing fundraising would be incompatible with that purpose. On these facts, the Court held that government did not intend to create a limited public forum. See Cornelius, 473 U.S. at 804, 105 S.Ct. at 3450 ("In cases where the principal function of the ... [forum] would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum."). Accordingly, the Court reviewed the denial of access of the political advocacy groups only for reasonableness. See id. at 803, 105 S.Ct. at 3449 (Court will not "infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity.").
 
 
 70
 In Perry, the Court likewise held that government's restrictions on the forum's use rendered that forum nonpublic. In Perry, a collective bargaining agreement provided that the Perry Education Association, but no other union, would have access to the interschool mail system and teacher mailboxes in the Perry Township schools. In rejecting a rival union's First Amendment claim to access to the mail system, the Supreme Court emphasized that school officials had not opened the mail system for use by the general public, but rather had reserved it for official, "school-related business." Perry, 460 U.S. at 48, 103 S.Ct. at 956.
 
 
 71
 Although the Court noted that "some" outside organizations had been permitted to use the mail system, it found "no ... evidence in the record" that the mail system had been opened for use by the general public or that "permission has been granted as a matter of course." Id. at 47, 103 S.Ct. at 956. Rather, the Court found that access had been limited to those groups whose expression was consistent with the forum's purpose as a conduit for communication on school-related matters.[5] While the admitted groups were "engage[d] in activities of interest and educational relevance to students," id. at 48, 103 S.Ct. at 956, the rival union was "concerned with the terms and conditions of teacher employment," id.--matters inconsistent with the forum's purpose. Accordingly, the denial of access to the rival union was reviewed only for reasonableness.
 
 
 72
 Finally, in Hazelwood, the Court held that a school newspaper published as part of a journalism class was a nonpublic forum because officials had not opened the forum for " 'indiscriminate use,' " Hazelwood, 484 U.S. at 267, 108 S.Ct. at 567 (quoting Perry, 460 U.S. at 47, 103 S.Ct. at 956), but rather, had "reserve[d] [that forum] for other intended purposes" id. (citing Perry, 460 U.S. at 47, 103 S.Ct. at 956): teaching journalism skills and ethics, see id., 484 U.S. at 267-70, 108 S.Ct. at 567-69. Two student-written articles that failed to meet elementary journalistic standards of fairness were rejected by the journalism teacher. See Hazelwood, 484 U.S. at 263-64, 108 S.Ct. at 565-66.[6] Once again the principal function of the forum--in this case to teach students responsible journalism--would be subverted by the challenged expression. On these facts, the Court held that school officials did not intend to turn a curricular newspaper into a limited public forum, and applied only reasonableness review.
 
 
 73
 In Cornelius, Perry and Hazelwood, then, the Court reviewed government's content-based exclusions only for reasonableness because government, by circumscribing its discretion, reduced the risk that it was denying access to the forum based on subject matter or viewpoint. In each case, the forum was reserved for a specific, lawful purpose--whether raising money for a specified class of charities, communicating school business or teaching journalism. These purposes operated as standards guiding government's content-based decisions: expression compatible with those purposes was permitted; incompatible expression--be it solicitation by political advocacy groups, a rival union's politicking, or journalistically substandard articles--was turned away. Deferential review was thus appropriate in each circumstance because government officials, by their own action, restricted their ability to act as censors in deciding who may and who may not have access to the forum. With the risk of censorship thus attenuated, the government's exclusions warranted only reasonableness review.
 
 
 74
 In contrast, government's content-based exclusions in Southeastern Promotions and Widmar triggered heightened scrutiny. Unlike in Hazelwood, Perry and Cornelius, government in these cases did not reserve the forum for a specific purpose that provided standards that guided its decisions to grant or deny access to the forum. Rather, in each case, the forum was opened indiscriminately with no purpose that effectively limited government's discretion to censor. As a result, the risk was heightened that officials were suppressing expression based on its subject matter or viewpoint, rather than out of legitimate concern that it would "hinder the [forum's] effectiveness for its intended purpose." Cornelius, 473 U.S. at 811, 105 S.Ct. at 3453. Accordingly, the decisions denying access required heightened review.
 
 
 75
 In Southeastern Promotions, 420 U.S. at 555, 95 S.Ct. at 1244, the Court held that a municipality that opened its theater facilities as "common meeting place[s] ... for ... cultural advancement, and for clean, healthful, entertainment ..." Id. at 549 n. 4, 95 S.Ct. at 1242 n. 4, had created limited public fora "designed for and dedicated to expressive activities." Id. at 555, 95 S.Ct. at 1244. Because local officials had opened the forum to theater groups indiscriminately without restricting their discretion to deny access to productions they disliked, the Court held that the review board could not, without satisfying heightened review,[7] exclude a single production, "Hair." See id. at 553-56, 95 S.Ct. at 1243-45.
 
 
 76
 Likewise, in Widmar, the Court held that a public university that allowed more than 100 student groups to use its facilities had "created a forum generally open for use by student groups," 454 U.S. at 267, 102 S.Ct. at 273, thereby manifesting its intent to create a limited public forum. Id. at 270, 102 S.Ct. at 274. Thus, the Court held that the university's adoption of a written policy excluding student religious groups from the forum amounted to "discriminat[ion] against [those] groups ... based on their desire to use a generally open forum to engage in religious worship and discussion." Id. at 269, 102 S.Ct. at 274. Because the university singled out religious expression for exclusion in a forum opened to student expression generally, the Court applied strict scrutiny. See id. at 269-70, 102 S.Ct. at 274.
 
 
 77
 In both Southeastern Promotions and Widmar, then, government generally opened its facilities for expressive activities, and then singled out particular expression for exclusion. Because the fora were opened generally, rather than selectively, there were no standards limiting the discretion of officials to engage in content control. This unbridled discretion to regulate expression raised an unacceptable risk that government was engaging in censorship. As the Court in Southeastern Promotions put it, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." 420 U.S. at 553, 95 S.Ct. at 1244.
 
 
 78
 When the facts of this case are viewed through the prism of these Supreme Court public forum cases, it becomes clear that this case is controlled by Southeastern Promotions and Widmar, and is readily distinguishable from Cornelius, Perry and Hazelwood.
 
 
 79
 As in Southeastern Promotions and Widmar, the Clark County School District opened its forum for indiscriminate, not selective, use. As the district court found, ads were accepted from a "great variety" of advertisers including "modeling agencies, The Folies Bergere [sic], casinos, card rooms, medical clinics, orthodontists, optometrists, chiropractors, dentists, dermatologists, lounges and bars, churches, the armed services, political candidates, credit union [sic] and banks, and tanning salons." ER 70 at 8-9.
 
 
 80
 The spectrum of ads ranged from the social to the spiritual, the psychological to the political. The ads included a notice from the Indian Springs Casino offering "Packaged Liquor ... Live Entertainment ... Lots of Slots ..." ER 57 at 8-E. The district also accepted ads from the Mormon Church, the Southern Baptist Church, the United States Army, the Selective Service, and candidates for Attorney General and the State Assembly. Quoting Proverbs 3:5 & 6, an advertisement from the Grace Bible Church urged students to "[t]rust in the Lord with all thine heart; and lean not unto thine own understanding. In all thy ways acknowledge HIM, and HE shall direct thy paths." ER 57 at 8-Y. In other words, space was sold to one and all--except Planned Parenthood.
 
 
 81
 As in Southeastern Promotions and Widmar, the Clark County School District was exercising unbridled discretion to regulate expression. Indeed, the facts in Widmar are virtually identical to those here; in Widmar, the university opened up its fora to 100 student groups, excluding only religious groups; here the school district sold space to 100 advertisers, excluding only Planned Parenthood. See ER 57 at 6:12. In both cases, the government's unbridled discretion to regulate expression raised the attendant risk of viewpoint or subject matter discrimination. Given the facts of this case, and the corresponding risk of censorship, we should follow the Supreme Court's mandate in Southeastern Promotions and Widmar and apply heightened review. As the Court in Southeastern Promotions put it, "[i]nvariably, the Court has felt obliged to condemn systems in which the exercise of such authority was not bounded by precise and clear standards." The reason is quite basic: the threat to First Amendment values is too great when "no standards appear anywhere; no narrowly drawn limitations; no circumscribing of ... [government's] absolute power...." Niemotko v. Maryland, 340 U.S. 268, 277, 71 S.Ct. 325, 330, 95 L.Ed. 267 (1951).
 
 
 82
 Even if the Clark County School District could somehow show that it reserved the ad space for a specific, lawful purpose that narrowed its discretion, it still could not escape strict scrutiny. In Cornelius, Perry and Hazelwood, reasonableness review was appropriate only because the challenged expression was clearly incompatible with the use to which the facilities had been reserved. See supra at 832-34. That is not the case here. Planned Parenthood's ad is no more incompatible with the school district's purpose in opening up its publications to advertisers than "Hair" was incompatible with the municipality's purpose in opening up its theaters for theatrical expression in Southeastern Promotions.
 
 
 83
 Selling advertising served one purpose: to raise money. Planned Parenthood's ad, which would have been paid for like any other, was obviously compatible with that purpose. Moreover, the district does not claim that the ad was inconsistent with written guidelines barring advertisements for products that were unlawful or inappropriate for minors.[8] Planned Parenthood's ad was not illegal and the district makes no claim that it was inappropriate for high school students.
 
 
 84
 I thus find no basis for holding, as the Court did in Cornelius, Perry and Hazelwood, that the school district created a nonpublic forum. Because the district opened its publications to advertisers not selectively, but indiscriminately, without limiting access in a way that circumscribed its discretion to discriminate based on subject matter or viewpoint, this case cannot be distinguished in any principled way from Southeastern Promotions or Widmar. Having created a limited public forum, the school district may not single out particular expression for exclusion without satisfying heightened review. The risk of censorship is simply too great. As the Court put it, "[o]ur distaste for censorship--reflecting the natural distaste of a free people--is deep-written in our law." Southeastern Promotions, 420 U.S. at 553, 95 S.Ct. at 1243.
 
 II
 
 85
 Notwithstanding the fact that the school district opened its advertising space to the public generally, the majority holds that the district did not intentionally create a limited public forum. This holding rests on a public forum test the majority plucks out of the air.
 
 
 86
 The majority disregards the Supreme Court's public forum test, which focuses on the degree to which government facilities are opened to the public. The majority's test determines the nature of the forum solely on the basis of whether government declares its intent to control content. As the majority puts it, the school district's "intent is most clearly evidenced by written policies that explicitly reserve the right to control content." Majority Opinion at 828.
 
 
 87
 Under the majority's test, then, so long as officials reserve for themselves broad discretion to control content, then they will be deemed to have "intended" to create a nonpublic forum, and their content-based exclusions will escape strict scrutiny. This test establishes as the law of our circuit a standard that is heresy in First Amendment jurisprudence.
 
 
 88
 In Southeastern Promotions, the Supreme Court squarely rejected the majority's formulation of the public forum test. To justify its rejection of "Hair," the municipal review board relied on written policies that "empowered [it] to determine whether ... applicant[s] should be granted permission ... on the basis of its review of the content of the proposed production." 420 U.S. at 554, 95 S.Ct. at 1244; see also id. at 549, 95 S.Ct. at 1242 (statement of Respondent Conrad citing written policy stipulating that the board would allow only "those productions which are clean and healthful and culturally uplifting...."). The regulatory policies on which the board relied were even more restrictive than the school district's here because "[a]pproval was not a matter of routine; instead, it involved the 'appraisal of facts, the exercise of judgment, and the formation of an opinion' by the board." 420 U.S. at 554, 95 S.Ct. at 1244 (citation omitted). Thus, the municipal board declared its intent to control content, just as the majority says the school district did here. Nonetheless, the Court in Southeastern Promotions held that the municipal board, in opening its facilities indiscriminately to theater groups, created a limited public forum.
 
 
 89
 Likewise, in Widmar the Court looked beyond the university's written policies declaring the intent to exclude religious groups from its facilities. Because the university had opened its facilities for indiscriminate use by student groups, the Court held that it intentionally created a limited public forum. Thus, even though university officials reserved the right to regulate content, the Court held that having opened wide its doors, the university could not close them to religious expression without satisfying strict scrutiny.
 
 
 90
 The majority never comes to grips with either Southeastern Promotions or Widmar. Aside from cursorily stating the holdings of each case in a footnote, see Majority Opinion at 823 n. 9, the majority pretends as though these cases did not exist. But we are not talking about fairytales. We are talking about Supreme Court precedent. And no matter how vigorously the majority waves its wand, Southeastern Promotions and Widmar will not go away.
 
 III
 
 91
 Despite the teaching of Southeastern Promotions and Widmar that an official declaration to control content does not control the nature of the forum, the majority claims that its public forum test emanates from, and is supported by, Hazelwood. Indeed, in applying its test, the majority purports to focus on the "factors ... that the Court found significant in Hazelwood...." Majority Opinion at 823. But the majority's test finds no support in Hazelwood. A comparison of the majority's discussion of Hazelwood with the Court's analysis in Hazelwood shows that its reliance on, and interpretation of, Hazelwood is untenable.
 
 
 92
 At bottom, the incompatibility of the majority's test with the Supreme Court's approach in Hazelwood rests on the simple fact that, in determining whether the school newspaper was a limited public forum, the Court considered far more factors than the majority does, and engaged in a far more sophisticated analysis than it does. Unlike the majority, the Hazelwood Court did not limit its inquiry to whether school officials declared their intent to control content. Rather, it focused on whether school authorities opened the forum " 'for indiscriminate use,' " Hazelwood, 484 U.S. at 267, 108 S.Ct. at 567 (quoting Perry, 460 U.S. at 47, 103 S.Ct. at 956), thereby intentionally creating a limited public forum, or "reserved [that forum] for other intended purposes," id. (citing Perry, 460 U.S. at 47, 103 S.Ct. at 956), and excluded expression incompatible with those purposes, thereby maintaining a nonpublic forum. In making this inquiry, the Supreme Court, in its public forum jurisprudence, has consistently examined government's policies and practices in each particular case as a means of determining whether government has intended to create a nonpublic or a limited public forum. See Perry, 460 U.S. at 47, 103 S.Ct. at 956.
 
 
 93
 An analysis of the Hazelwood Court's methodology illustrates where the majority goes wrong. The Hazelwood test, like the majority's test, looks first to the school's written policies. However, under the majority's test, these policies are the beginning and the end of the inquiry: if they manifest government's intent to control content, they ipso facto manifest an intent to create a nonpublic forum. See Majority Opinion at 823. Under the Hazelwood test, by contrast, examination of government's policies is only the first step. These policies were considered, not simply to determine whether government intended to control content, but also whether government granted the public indiscriminate use of the forum or reserved it for a specific purpose that guided its content exclusions and justified its exclusion of expression incompatible with that purpose.
 
 
 94
 In Hazelwood, the forum was created for the purpose of teaching journalism skills and ethics--a purpose that was inconsistent with creating a public forum. In publishing a newspaper as part of a journalism class, the Hazelwood school officials did not manifest an intent to give students, let alone the public, free reign of that forum. As a matter of common sense, journalism students cannot be taught proper journalism skills and ethics if their articles are not screened by a journalism instructor to ensure that they measure up to basic standards of fairness and accuracy. Every journalist's articles are subjected to this kind of editorial control. Thus, in order to serve the newspaper's instructional purpose, it had to remain a nonpublic forum. In short, Hazelwood teaches that government cannot escape strict scrutiny unless its content-based regulations are informed by, and in accordance with, the forum's designated purpose.
 
 
 95
 The majority's test ignores all discussion of purpose. Although the majority acknowledges that the purpose of the advertising columns was to raise money, it never addresses how that purpose related to the school district's rejection of Planned Parenthood's ad. Beyond acknowledging the purely money-making purpose of selling ads, what the majority says is either factually wrong[9] or irrelevant.[10] Indeed, under the majority's test, government need not establish a purpose for the forum that relates to content control; government must merely demonstrate an intent to discriminate on the basis of content.[11]
 
 
 96
 In sum, the majority's test makes two fundamental errors that contravene Hazelwood, as well as the rest of the Court's public forum jurisprudence. First, it incorrectly elevates government's policies to be the sole determinant of government's intent to create a nonpublic or a limited public forum, when Hazelwood clearly uses them as but one indicator of government's intent. Second, the majority's test uses government policies to determine whether government intended to control content, when Hazelwood examines them for a completely different reason: whether government granted the public indiscriminate use of the forum or reserved it for a specific, lawful purpose that limited government's discretion to deny access based on subject matter or viewpoint.
 
 
 97
 The majority test compounds these mistakes with another elemental error. While the Hazelwood test requires a searching examination of government's actual practices, the majority not only deemphasizes the importance of the practices in this case, but also establishes a test that, by definition, makes those practices virtually irrelevant. In so doing, its methodology contravenes the Supreme Court's mandate to construe government's intent to create a nonpublic or a limited public forum by examining its policies and practices. See Perry, 460 U.S. at 47, 103 S.Ct. at 956.
 
 
 98
 In Hazelwood, after considering the school's policies, the Court examined whether the school's practices supported its claim that it had not granted students or the public indiscriminate use of the newspaper, but rather, had reserved it "as a supervised learning experience for journalism students," Hazelwood, 484 U.S. at 270, 108 S.Ct. at 569. The Court noted that the school's journalism teacher "both had the authority to exercise and in fact exercised a great deal of control...." over the forum. Id. at 268, 108 S.Ct. at 568 (emphasis added). Moreover, the Court emphasized that "[s]chool officials did not deviate in practice from their policy that production of Spectrum was to be part of the educational curriculum and a 'regular classroom activit[y].' " Id. (emphasis added) (citation omitted). In other words, the fact that the school's practices were consistent with its claim that it had designated the forum for classroom purposes demonstrated that the school had "reserve[d] the forum for its intended purpose," Id. at 270, 108 S.Ct. at 569 (citing Perry, 460 U.S. at 47, 103 S.Ct. at 956), and regulated expression in accordance with that purpose, thereby creating a nonpublic forum.
 
 
 99
 Unlike the Hazelwood test, however, the majority's test explicitly deemphasizes the importance of government's practices. The majority's opinion baldly states that a focus on practices "misdirect[s] the inquiry." Majority Opinion at 825-26. This statement by itself casts into doubt the entire approach taken by the majority, as it evinces a misunderstanding of the analysis in which the Hazelwood Court engaged.
 
 
 100
 Even if the majority had recognized the importance of scrutinizing government's practices, its test would make those practices, by definition, irrelevant. If, under the majority's test, the school district adopted a policy that gave it broad discretion to control content, then the majority could not but conclude, as it did, that the district's "practices were not inconsistent with the[ ] policies." Majority Opinion at 823. No matter what its actual practice, the Clark County School District could still persuasively argue that it was acting consistently with its policy, because the policy allowed it to do whatever it pleased. Surely, the Supreme Court, in requiring courts to examine practices, could not have envisioned such a test.
 
 
 101
 Moreover, the majority explicitly dismisses the importance of focusing on the particular government practices in this case. Although the majority acknowledges that the "schools solicited and accepted an array of advertising, including some for casinos ... and some for providers of health services to whom Planned Parenthood analogizes itself," id. at 825, it summarily dismisses, without explanation, the school district's practices. Id. at 825-26.
 
 
 102
 Equally as egregious, the majority, in giving short-shrift to the school district's practices, ignores the clear teaching of Southeastern Promotions that, when they conflict, courts will characterize the forum based on government's actual practices as opposed to its stated policies. See Southeastern Promotions, 420 U.S. at 555, 95 S.Ct. at 1245 (theater facilities held to be limited public fora, despite regulatory policies that gave municipal board broad discretion to control content). When practice and policy collide, what government does carries as much, if not more, weight than what government says. And what government did in this case was to sell space to any advertiser that came along--except Planned Parenthood.
 
 
 103
 Finally, in relying on the pedagogical concerns the Court found relevant in Hazelwood, the majority contravenes the Supreme Court's mandate to consider only those pedagogical concerns that relate to the forum as defined and its purpose.
 
 
 104
 The majority claims to give credence to Cornelius' mandate that we first define the relevant forum, and define it in terms of the "access sought by the speaker," see Majority Opinion at 822 & n. 4 (quoting Cornelius, 473 U.S. at 801, 105 S.Ct. at 3448)--in this case, the advertising space alone. See id. But that's where the majority's compliance with Supreme Court precedent stops. The majority misses the entire significance of why the Court requires us, as a threshold step, to define the relevant forum. See Cornelius, 473 U.S. at 800, 105 S.Ct. at 3447.
 
 
 105
 The definition of the forum is the threshold step in the public forum inquiry for a critical reason: we cannot determine whether government opened its forum indiscriminately or reserved that forum for a specific, lawful purpose that circumscribed its content-based decisions, see Hazelwood, 484 U.S. at 267, 108 S.Ct. at 567, without knowing exactly what the forum in dispute is. See Cornelius, 473 U.S. at 800, 105 S.Ct. at 3447. Only when we know the precise perimeters of the forum can we decide whether that forum had a particular, lawful purpose, and if so, whether the challenged expression was incompatible with that purpose.
 
 
 106
 In Cornelius, the Court, as a threshold issue, had to determine whether the forum from which the expression was excluded was the federal workplace as a whole, or the charity drive during which the plaintiffs wished to solicit contributions. See id. at 800-01, 105 S.Ct. at 3447-48. Only after defining the relevant forum could the Court decide whether that forum had been reserved for a specific purpose, and if so, whether the excluded expression was incompatible with that purpose. As the Cornelius Court stated, our "forum analysis is not completed merely by identifying the government property at issue." See id. at 801, 105 S.Ct. at 3448. Rather, we must first define the relevant forum before we can determine "whether it is public or nonpublic in nature," id. at 800, 105 S.Ct. at 3448--a process that requires us to construe government's intent not only from its policies and practices, but also by "the nature of the property and its compatibility with expressive activity." Id. at 802, 105 S.Ct. at 3449.[12]
 
 
 107
 The definition of the relevant forum here has as much significance as it had in Cornelius. The forum's definition as the advertising space alone[13] means that we may consider only those policies and practices that relate to the advertising space in determining whether school officials reserved the forum for a particular, lawful purpose that guided its content-based decisions and justified its exclusion of expressive activity incompatible with that purpose. All other policies and practices are simply irrelevant.
 
 
 108
 The majority misses the significance of defining the relevant forum. It attributes to the school district in this case the same "pedagogical concerns" referred to in Hazelwood. See Majority Opinion at 827 ("The school has the same pedagogical concerns, [as in Hazelwood ] such as respecting audience maturity, disassociating itself from speech inconsistent with its educational mission and avoiding the appearance of endorsing views, no matter who the speaker is.").[14] However, the majority offers no explanation as to how such concerns relate to the purpose of the forum at issue here--the advertising space.
 
 
 109
 In Hazelwood, the pedagogical concerns flowed directly from the forum's purpose as a "supervised learning experience for journalism students." 484 U.S. at 270, 108 S.Ct. at 569. However, this case does not involve a claimed right to editorial expression in a curricular newspaper. In selling advertising space, Clark County school officials were not acting in their capacity as educators; they were acting as business managers concerned with the district's financial affairs. The pedagogical concerns the Court found relevant in Hazelwood thus have no bearing on the purpose of the advertising space--to raise money.
 
 
 110
 Had the advertising space been part of a curricular program designed to teach students advertising and management skills, pedagogical concerns would have informed our understanding of whether school officials opened up the forum indiscriminately or reserved it for a particular purpose that circumscribed its content-based decisions. But the school district does not claim that it sold advertising space for any instructional purpose. Moreover, the athletic programs were published entirely apart from the school curriculum. Only the advertising space's actual purpose --to raise money--can inform our determination of whether that space is public or nonpublic. In relying on the pedagogical concerns the Court found relevant in Hazelwood, the majority misses the mark.
 
 IV
 
 111
 Having concluded that the Clark County School District, in selling advertising space indiscriminately to the public, created a limited public forum, I now examine whether the district's rejection of Planned Parenthood's ad satisfies strict scrutiny. To survive strict scrutiny, the district's refusal to run Planned Parenthood's ad must be supported by a compelling state interest and be narrowly tailored to achieve that interest. See Widmar, 454 U.S. at 270, 102 S.Ct. at 274. Throughout, the school district bears this evidentiary burden. See id.
 
 
 112
 The school district argues that its refusal to sell advertising space to Planned Parenthood was supported by a compelling interest in preserving its educational mission and avoiding disruptive controversy. By excluding Planned Parenthood's ad, officials sought to remain neutral on a controversial issue. See ER 57 at 11-15. In addition, school principals stated that they did not wish to open their publications to groups offering the same services as Planned Parenthood or to organizations with competing views on issues of family planning.
 
 
 113
 By the school district's own admission, then, its refusal to publish Planned Parenthood's ad was rooted in a desire to avoid controversy. This rationale does not pass First Amendment muster. As the district court declared in its original[15] decision, "[a] policy to avoid ... conflicts among persons or groups of persons is not a compelling state interest and therefore cannot justify refusal to publish protected speech." ER 70 at 11:4 (citing Carey v. Population Services Int'l, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977)). See also Cornelius, 473 U.S. at 811, 105 S.Ct. at 3453 ("the avoidance of controversy is not a valid ground for restricting speech in a public forum").
 
 
 114
 Not only is avoidance of controversy in a public forum not a compelling state interest, but the school district has made no showing that publishing Planned Parenthood's advertisement would have interfered with its educational mission. Indeed, school officials admitted that they had no legitimate basis for believing that Planned Parenthood's ad would have disrupted their educational programs. One principal who rejected Planned Parenthood's ad out of fear that it would be controversial conceded that "he did not know how his community would react if the advertisement was published." ER 57 at 11-12:40. Other principals acknowledged that they did not believe that the ads would interfere with education or discipline in their schools. See ER 57 at 12-13:42, 13-14:44, 14:46.
 
 
 115
 At best, then, the record shows that school authorities shied away from an ad for family planning services because they feared it might be offensive to some people. Such an indiscriminate content-based exclusion based on undifferentiated fears plainly offends constitutional norms. See Police Dep't of Chicago v. Mosley, 408 U.S. 92, 100-01, 92 S.Ct. 2286, 2292-93, 33 L.Ed.2d 212 (1972) ("[p]redictions about imminent disruption ... involve judgments appropriately made on an individualized basis, not by means of broad classifications, especially those based on subject matter"); Tinker v. Des Moines Indep. School Dist., 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969) ("in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression"); Population Services Int'l, 431 U.S. at 701, 97 S.Ct. at 2024 ("the fact that protected speech may be offensive to some does not justify its suppression").
 
 
 116
 Moreover, the school district offers no compelling reason for singling out Planned Parenthood's ad for suppression. Without such a reason, the district cannot reject Planned Parenthood's ad, while accepting other ads dealing with controversial issues. See Mosley, 408 U.S. at 100, 92 S.Ct. at 2292 (State may not bar some picketing, but allow others, "unless that picketing is clearly more disruptive than the picketing [the state] already permits."); Carey v. Brown, 447 U.S. 455, 471, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263 (1980) (state statute barring picketing of residences or dwellings, but allowing peaceful picketing of places of employment not supported by a compelling state interest).
 
 
 117
 As in Mosley and Brown, the school district has made no showing that Planned Parenthood's ad would have been more controversial than ads from political candidates, churches, casinos and bars.[16] These ads qualified as controversial under the school district's own definition of a controversial issue as "any problem which society is in the process of debating and for which more than one solution may be offered and supported by individuals or any groups of people." ER 57, Defendants' Exhibit D at D-2. Political candidates and differing religious groups clearly are engaged in "the process of debating" issues about which reasonable people invariably disagree. Likewise, whether or not casinos and bars are considered routine in Las Vegas, "society," as the school district puts it, certainly debates their worth. Because the school district allowed some controversial expression, but rejected Planned Parenthood's ad without a compelling justification, its rejection of Planned Parenthood's ad is constitutionally impermissible.
 
 
 118
 In concluding that the school district has failed to establish a compelling interest served by its suppression of Planned Parenthood's ad, I emphasize what the school district does not argue. The school district, to its credit, does not argue that Planned Parenthood's ad is somehow inappropriate for high school students. In this respect, the case is distinguishable from Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), where a public school justified its discipline of a student for making a speech on the ground that the speech was "wholly inconsistent with the 'fundamental values' of public school education," id. at 685-86, 106 S.Ct. at 3165, and "would undermine the school's basic educational mission" id. at 685, 106 S.Ct. at 3165 (citation omitted).
 
 
 119
 The school district does, however, make the curious argument that advertising Planned Parenthood's services in its school publications is somehow inconsistent with a Nevada statute requiring that classroom instruction in the human reproductive system, communicable disease and sexual responsibility be taught by qualified teachers.[17] Underlying the school district's reliance on this statute are two equally misguided assumptions.
 
 
 120
 First, the school district's argument implies that the Nevada legislature intended not only to regulate the teaching of sex education in the schools, but also to regulate family planning services offered outside the school environment. Plainly, however, the statute regulates only the instruction of sex education in, and not outside of, the school environment. By relying on the Nevada legislation, the school district mistakenly assumes that the state legislature intended to deny student access to information about the availability of family planning services in the community generally. But public schools do not have a monopoly on family planning instruction, and there is no indication that the Nevada legislature intended to grant them one.
 
 
 121
 Second, the school district, in relying on the Nevada statute, assumes that publishing Planned Parenthood's ad would interfere with its mission of carrying out the mandate of the statute. In making this assumption, the school district mistakenly equates classroom instruction in the human reproductive system--the activity the statute regulates--with an advertisement for those services offered by Planned Parenthood outside the school environment. In this argument, the school district is mixing apples and oranges. An advertisement that Planned Parenthood offers family planning services is just that--an advertisement. It offers no instruction on the human reproductive system, related communicable diseases or sexual responsibility, which are the concerns of the statute. Rather, it merely advertises only that family planning services are available at Planned Parenthood. In other words, teaching sex education in the schools is one thing; advertising the availability of Planned Parenthood's services is quite another.
 
 
 122
 In short, then, the Nevada statute regulating who may teach sex education in the schools provides no justification for the school district's suppression of Planned Parenthood's ad. The statute regulates neither the provision nor the advertisement of family planning services outside the school environment. In resorting to the statute as a justification for its actions, the school district is grasping at straws.
 
 V
 
 123
 At bottom, then, the majority's opinion reflects a judicial mindset that, anytime a First Amendment issue can be said to arise out of the "school environment," decisions of school authorities restricting protected expression will receive minimal scrutiny. The majority is correct that we are not school board members. But we are Article III judges, entrusted with the responsibility to review official action to ensure that it does not offend constitutional norms.
 
 
 124
 In determining whether the Clark County School District's refusal to run Planned Parenthood's ad was reviewable under strict scrutiny or a standard of reasonableness, the majority eviscerates the Supreme Court's public forum jurisprudence. Had the majority not been so impressed with the fact that this dispute occurred in the "school environment," perhaps it would not have so grossly misread the Court's public forum "intent" test. No matter where a First Amendment dispute over access to government facilities occurs, the applicable level of scrutiny must be determined on the basis of the same question: whether government opened up the forum indiscriminately to the public, thereby manifesting its intent to create a limited public forum, or reserved that forum for a specific, lawful purpose and excluded expression incompatible with that purpose, thereby manifesting its intent to create a nonpublic forum. Whether officials have declared their intent to control content is merely one factor among many.
 
 
 125
 Had the majority asked the right question, it could not but have concluded that the Clark County School District, in selling advertising space to the public indiscriminately, manifested the intent to create a limited public forum. This holding would not stop educators from banning ads for liquor, drugs, X-rated movies or other products inappropriate for minors. Banning ads for such products would easily pass First Amendment muster, either under strict scrutiny or reasonableness review. Nor would this decision thrust federal judges into the midst of educational decisions appropriately left to school authorities. What this holding would do, however, is protect a fundamental First Amendment value: freedom from unwarranted government censorship. When a government opens wide its doors, it cannot shut them discriminatorily to a few without satisfying the most stringent constitutional safeguards. And with good reason: "the danger of censorship and of abridgement of our precious First Amendment freedoms is too great where officials have unbridled discretion...." Southeastern Promotions, 420 U.S. at 553, 95 S.Ct. at 1243.
 
 
 
 [1]
 The memo, designed to "provide guidance" to principals as to what power over advertising they possess, states in part:
 A school has an important interest in avoiding the impression that it has endorsed a viewpoint at variance with its educational program. It is not at all unlikely that an advertisement may be viewed as school endorsement of its contents....
 ... If a school publication does accept advertising, some categories of advertising may be excluded. Drug, paraphernalia, or alcoholic beverage advertisements, for example, may be viewed as encouraging action which might endanger the health and welfare of students. Advertisements which are libelous, vulgar, racially offensive, factually inaccurate, or of poor production quality ... may be excluded. Advertisements having explicit sexual content or overtones may be excluded. The courts have allowed wide latitude in proscribing material which, though not obscene, because of its sexual content is deemed inappropriate for minors.
 If advertising is allowed which promotes one side of a controversial issue, advertisements promoting the opposing side of a controversy should be similarly accepted.
 ... The purpose of this memo is to provide guidance to principals as to what power over advertising in [school district] publications they possess. How their power is used is within their discretion.
 
 
 [2]
 The advertisements read:
 PLANNED PARENTHOOD
 OF SOUTHERN NEVADA, INC.
 
 
 [601]
 South Thirteenth Street
 Las Vegas, Nevada 89101
 Routine Gynecological Exams
 Birth Control Methods
 Pregnancy Testing & Verification
 Pregnancy Counseling & Referral
 
 
 [3]
 The majority held that the student newspapers were a limited public forum and the school district's refusal to publish CARD's advertisements violated the first amendment. See discussion infra Part IIB
 
 
 [4]
 When identifying the relevant forum, we focus "on the access sought by the speaker." Cornelius, 473 U.S. at 801, 105 S.Ct. at 3448. Thus, in Hazelwood, the forum analyzed was Spectrum, the school newspaper; in Cornelius, the Combined Federal Campaign fundraising program; in Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 49, 103 S.Ct. 948, 957, 74 L.Ed.2d 794 (1983), the internal school mail facilities; and in Lehman v. City of Shaker Heights, 418 U.S. 298, 300, 94 S.Ct. 2714, 2715, 41 L.Ed.2d 770 (1974) (plurality), advertising spaces on city buses. See also CARD, 790 F.2d at 1483 (Wallace, J., dissenting) (the "fora that we must address consist of the advertising spaces in the five [school] papers")
 
 
 [5]
 The Court has recognized that the State, like a private property owner, has "power to preserve the property under its control for the use to which it is lawfully dedicated." Cornelius, 473 U.S. at 800, 105 S.Ct. at 3448 (quoting Greer v. Spock, 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976)). It has adopted the now familiar public forum analysis as a means of determining when the government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Id; Perry, 460 U.S. at 45-47, 103 S.Ct. at 954-56
 A traditional public forum is property, such as a street or park, that has immemorially been open to the public for expressive activity. In public forums the government may enforce content-based regulations only if necessary to achieve a compelling state interest and if narrowly tailored to serve that end. Cornelius, 473 U.S. at 800, 105 S.Ct. at 3447; Perry, 460 U.S. at 45, 103 S.Ct. at 954. The government may also open property for general use by the public, or some segment of the public, as a place for expressive activity. In public forums created by government designation, content-based restrictions must meet the same standard applied in a traditional public forum. Cornelius, 473 U.S. at 800, 105 S.Ct. at 3447; Perry, 460 U.S. at 45-46 & 46 n. 7, 103 S.Ct. at 954-55 & 955 n. 7. Public property which is not a public forum either by tradition or designation is subject to a different standard. In a nonpublic forum the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Perry, 460 U.S. at 46, 103 S.Ct. at 955; see also Cornelius, 473 U.S. at 800, 105 S.Ct. at 3448.
 
 
 [6]
 The principal took this action because he believed that certain references to sexual activity and birth control in an article discussing students' experiences with pregnancy were inappropriate for some of the younger students at the school. He further felt that the article did not adequately protect the privacy interests of the pregnant students, who still might have been identifiable despite the use of false names. The principal found another article discussing divorce objectionable because it contained derogatory remarks about a student's father, without affording the parent an opportunity to respond. Given that there was insufficient time before the end of the school year to delay the printing, rather than publish no newspaper at all, the principal ordered the journalism teacher to remove the pages with the offending articles
 
 
 [7]
 Cf. Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 682, 106 S.Ct. 3159, 3163, 92 L.Ed.2d 549 (1986) (first amendment rights of students in public schools "are not automatically coextensive with the rights of adults in other settings"); New Jersey v. T.L.O., 469 U.S. 325, 340-43, 105 S.Ct. 733, 742-43, 83 L.Ed.2d 720 (1985) ("it is evident that the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject")
 
 
 [8]
 The Statement of Policy cited to Tinker, 393 U.S. 503, 89 S.Ct. 733, for this proposition, incorrectly, as the Court remarked. Hazelwood, 484 U.S. at 269 n. 2, 108 S.Ct. at 569 n. 2. Despite the breadth of these policy statements, the Court nevertheless viewed the evidence that school officials never intended to designate Spectrum as a public forum as "overwhelming." Id
 
 
 [9]
 In Widmar, the Court held that a university which had created a wide open and independent forum for registered student groups could not exclude those groups who sought to use the facilities for religious worship or discussion. The evidence indicated that but for the university's erroneous belief that allowing religious groups to use the facilities violated the Establishment Clause the university possessed the clear intent to open its facilities to all student groups. 454 U.S. at 267-70, 102 S.Ct. at 273-74. Similarly, in City of Madison, the Court found the necessary intent to create a public forum for the discussion of school board business. Because the board meetings were open to the public, pursuant to statute, the State created a forum for "direct citizen involvement" in which "any citizen could have presented precisely the same points and provided the board with the same information" as the excluded speaker; accordingly, the discrimination between speakers was impermissible. 429 U.S. at 174-75, 97 S.Ct. at 425-26. In Southeastern Promotions, where the Court held the city's decision to bar a performance of "Hair" in its municipal theaters an unlawful prior restraint, the Court characterized the theaters as "public forums designed for and dedicated to expressive activity." 420 U.S. at 555, 95 S.Ct. at 1245
 
 
 [10]
 As in Hazelwood, newspapers and yearbooks published in the Clark County School District are part of the course curriculum and serve a primarily educational purpose. Athletic programs are published as a service to spectators of school-sponsored athletic events, and are distributed at such events by the school. The audience, and activity, are school-related. Although not part of the course curriculum, athletic programs are nevertheless school publications regulated under the Hussey memorandum and guidelines
 
 
 [11]
 Planned Parenthood also contends that the "indiscriminate use" standard does not apply when dealing with public forums established for a limited purpose, such as use by certain speakers or for certain topics, or some combination of the two. See Widmar, 454 U.S. at 267-70, 102 S.Ct. at 273-74 (forum created for registered student groups); Madison, 429 U.S. at 174-76, 97 S.Ct. at 425-26 (forum limited to discussion of school board business); Kaplan v. County of Los Angeles, 894 F.2d 1076, 1080 (9th Cir.) (voter pamphlet a limited public forum for use by candidates to discuss limited range of topics), cert. denied, --- U.S. ----, 110 S.Ct. 2590, 110 L.Ed.2d 271 (1990). We disagree. To constitute a public forum, even a limited purpose forum, government property must be open for indiscriminate use within the purpose for which the forum was created, subject only to permissible content-neutral restrictions. See Hazelwood, 484 U.S. at 267, 108 S.Ct. at 567
 
 
 [12]
 Cf. Board of Educ. v. Mergens, 495 U.S. ---- - ----, 110 S.Ct. 2356, 2364, 110 L.Ed.2d 191 (1990) (Widmar extends to high schools that have created for student groups a "limited open forum" as defined in the Equal Access Act, 20 U.S.C. §§ 4071-4074)
 
 
 [13]
 See discussion infra Part III
 
 
 [14]
 Pursuant to school district policy, schools could reject any category of advertising. Principals may refuse advertisements not in the best interest of the school or community. It is not for us to second-guess the judgment of school officials in Las Vegas about the propriety or import of casino advertisements in their community
 
 
 [15]
 Planned Parenthood makes a further argument that the schools grant of access to various persons including other providers of health services created a limited public forum from which it may not be excluded because it is an entity of "similar character." See Perry, 460 U.S. at 48, 103 S.Ct. at 956. Because we do not believe the schools' policies or practices changed its publications from nonpublic to public, it is not necessary to reach this point
 
 
 [16]
 Judge Wallace dissented. He concluded that under Cornelius, the school board had not demonstrated the necessary clear intent to create a public forum, but rather reserved the newspapers as part of the schools' educational enterprise. Although he found the exclusion reasonable, he would have remanded the case to determine if the school board sought to discriminate on the basis of viewpoint. Id. at 1484-85 (Wallace, J., dissenting)
 
 
 [17]
 Cf. Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (plurality), in which the Court held that "[i]n much the same way that a newspaper or periodical, or even a radio or television station, need not accept every proffer of advertising from the general public, a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles" so long as the policies and practices governing access are not arbitrary, capricious or invidious. Id. at 303, 94 S.Ct. at 2717
 
 
 [18]
 For example, in CARD, the schools had accepted other advertisements relating to military service; the Board rejected the proposed advertisement on the ground that publication would contribute to solicitation of illegal acts by the district's students; the Board's policy and practice was to allow non-students to avail themselves of the forum as long as their speech consists of advertising offering goods, services or vocational opportunities to students; and the Board, having allowed presentation of one side of an issue, was trying to prohibit the presentation of the other side
 
 
 [19]
 We do not disturb the CARD majority's alternative holding that, assuming the school publications were nonpublic forums, the school engaged in impermissible viewpoint discrimination in accepting advertisements advocating military service but refusing CARD's advertisement offering an opposing point of view. CARD, 790 F.2d at 1481
 
 
 [20]
 This distinction between speech that is school-sponsored and speech that is not is consistent with the Court's decision in Mergens. In that case, voluntary, student-initiated religious clubs sought, under the Equal Access Act, 20 U.S.C. §§ 4071-4074, to hold meetings in high school facilities during noninstructional time without faculty participation. The Court held that the school's extending access to religious clubs under those conditions did not constitute an endorsement or support of religious speech so as to violate the Establishment Clause. See Mergens, 110 S.Ct. at 2371-73 (plurality)
 
 
 [21]
 Hazelwood, 484 U.S. at 273 & n. 7, 108 S.Ct. at 571 & n. 7. See also, e.g., Nicholson v. Board of Educ. Torrance Unified School Dist., 682 F.2d 858, 863-64 (9th Cir.1982) (cited approvingly in Hazelwood, 484 U.S. at 273 n. 7, 108 S.Ct. at 571 n. 7)
 
 
 [22]
 "The Government's decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation." Cornelius, 473 U.S. at 808, 105 S.Ct. at 3452 (emphasis in original)
 
 
 [23]
 Cf. Lehman, 418 U.S. at 304, 94 S.Ct. at 2717 ("[t]he city consciously has limited access to its transit system advertising space in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience. These are reasonable legislative objectives advanced by the city in a proprietary capacity")
 
 
 [1]
 The school district does make the curious claim that publishing Planned Parenthood's ad would conflict with a state statute requiring instruction in the human reproductive system, sexual responsibility and related communicable diseases to be taught in the classroom and by qualified teachers. I attach no weight to this argument because it is meritless. As I explain in Part IV, the statute does not regulate family planning services offered outside the school environment; nor does it control advertisements for those services
 
 
 [2]
 Indeed, the Supreme Court has stated that "selective exclusions in a public forum may not be based on content alone, and may not be justified by reference to content alone." Police Dept. of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). If government officials may not justify their content-based exclusions in a public forum on content alone, then surely they may not dictate the determination of whether a forum is public or nonpublic "by reference to content alone." Id. The majority's test allows them to do just that. See infra Parts II & III
 
 
 [3]
 I do not subscribe to the view, offered by some commentators, that the Court's public forum jurisprudence is "incoherent." See, e.g., Farber & Nowak, The Misleading Nature of Public Forum Analysis: Content and Context in First Amendment Adjudication, 70 Va.L.Rev. 1219 (1984) (arguing that the Court's public forum doctrine is incoherent). This view is, perhaps, understandable because the rationales and results in the Court's public forum jurisprudence appear, at times, to be in tension. I believe this tension stems from the fact that the cases are so fact-specific. When the Court's cases are read with an eye for their particular facts, the logic of the Court's rationale becomes apparent in terms of striking the proper balance between government's interest in orderly and efficient use of its own facilities, on the one hand, and the public's interest in gaining access to those facilities free of unwarranted censorship, on the other. See Cornelius, 473 U.S. at 800, 105 S.Ct. at 3448 ("The Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum.")
 
 
 [4]
 Cf. Niemotko v. Maryland, 340 U.S. 268, 277, 71 S.Ct. 325, 330, 95 L.Ed. 267 (1951) (government's practice of granting or denying use of a park violates First Amendment because "[n]o standards appear anywhere; no narrowly drawn limitations; no circumscribing of this absolute power....")
 
 
 [5]
 The majority says that in Perry the Court held that school authorities in that case did not create a limited public forum, "even though many private groups not affiliated with the school had access to and used the internal school mail facilities." Majority Opinion at 826 (emphasis added). This is an inaccurate characterization of the Perry facts. The Court specifically stated that the school's access policy was "selective." Perry, 460 U.S. at 47, 103 S.Ct. at 956
 
 
 [6]
 One article, about teenage pregnancy, was rejected because pregnant students, although not named, might be identified from the text. See Hazelwood, 484 U.S. at 263, 108 S.Ct. at 565. The second article, about divorce, identified a student by name and reported her complaints that her father " 'was always out of town on business or out late playing cards with the guys,' " and " 'always argued about everything' " with her mother. Id. (quoting article). The article did not include any response from either of the child's parents. See id
 
 
 [7]
 Although Southeastern Promotions is a limited public forum case, it involved a prior restraint, and thus was subjected to the rigorous standard of review appropriate for prior restraints. See Southeastern Promotions, 420 U.S. at 558, 95 S.Ct. at 1246 (quoting Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963)) (a prior restraint " 'comes ... bearing a heavy presumption against its constitutional validity.' ")
 
 
 [8]
 A memorandum by school official Daniel Hussey counseled that "[d]rug, paraphernalia, or alcohol beverage advertisements ... may be viewed as encouraging action which might endanger the health and welfare of students." ER 57, Defendants' Exhibit A. The memorandum discouraged "[a]dvertisements having explicit sexual content or overtures...." or advertising "though not obscene, because of its sexual content is deemed inappropriate for minors." Id. In addition, it cited "[a]dvertisements which are libelous, vulgar, racially offensive, factually inaccurate, or of poor production quality...." Id. The Hussey memorandum also stated that this list was "not meant to be [ ] exhaustive." Id
 The written guidelines adopted by five of the district's 15 high schools had barred advertisements for products similar to those described in the Hussey memorandum. The guidelines prohibited advertisements for X or R-rated movies, gambling aids, tobacco and liquor products, drug paraphernalia and pornography. See ER 57, Defendants' Exhibits K-U (reprinting advertising guidelines). The guidelines also excluded ads for birth control products or information. See id.
 
 
 [9]
 The majority claims that in addition to raising revenue, the purpose of the advertising space was to "impart journalistic management skills to students." Majority Opinion at 824. This assertion has no foundation in the record or the briefs. Indeed, the Clark County School District does not even claim that it had a pedagogical purpose in "impart[ing] journalistic management skills." Id. At most, the school district claims that it had a pedagogical interest in ensuring that advertisements in school publications did not conflict with a state statute requiring that education in the human reproductive system, related communicable diseases and sexual responsibility be taught in the classroom and by qualified teachers. However, the majority makes no attempt to establish any link between the school district's rejection of Planned Parenthood's ad and its mandate to comply with the statute. Such a link does not exist. See infra Part IV. Moreover, the majority offers no explanation as to how the athletic programs, which were published outside the school curriculum, had any educational purpose whatsoever. The majority itself states that "the schools did not accept advertising for any purpose other than to help defray the costs of" the programs. Majority Opinion at 824
 
 
 [10]
 The majority inexplicably states that "[t]here is no evidence that advertisements in newspapers or yearbooks were accepted for any purpose other than to enable the school to raise revenue to finance the publications...." Majority Opinion at 824. This statement misses the point. Planned Parenthood is not required to show that the school district had some other purpose for the ad space. Rather, the school district must show how that it reserved the forum for a specific purpose that narrowed its discretion to regulate expression and that Planned Parenthood's ad conflicted with that purpose
 
 
 [11]
 A hypothetical illustrates how the majority's test contravenes Hazelwood. Suppose a school board that has made its auditorium available to the public clearly expresses its intent to control the auditorium's content. Suppose, further, that it allows public groups to use the auditorium for a wide array of expressive activity. Nevertheless, the school board maintains broad discretion to deny access to the auditorium on the basis of content
 Under the majority test, as I have stated, the school board's manifested intent to censor would be determinative of its intent to create a nonpublic forum. The Hazelwood test, by contrast, would require a completely different analysis. Although, like the majority's test, the Hazelwood test would examine the school board's stated policy of controlling content, it would not find that stated intent dispositive. Rather, the Hazelwood test would focus, as a first step, on the school board's policies to determine whether they purported to grant the public indiscriminate use of the auditorium or whether they reserved the auditorium for a specific purpose that guided their content-based decisions. This threshold step would examine, for example, whether the school board had reserved the auditorium for curricular-related events, such as school plays and faculty or PTA meetings, or whether it had opened the auditorium indiscriminately to the public for disparate curricular- and non-curricular-related events.
 
 
 [12]
 In resolving this question, the Court stated that "[i]n cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property." Id. In defining the relevant forum as the charity drive itself, the Court relied upon other cases in which it limited the relevant forum to such narrow channels as an internal mail system, see id. (citing Perry, 460 U.S. at 46-47, 103 S.Ct. at 955-56)), and the advertising space on a city-owned transit system. See id. (citing Lehman v. City of Shaker Heights, 418 U.S. 298, 300, 94 S.Ct. 2714, 2716, 41 L.Ed.2d 770 (1974))
 
 
 [13]
 See San Diego Committee Against Registration and the Draft (CARD) v. Governing Board of Grossmont Union High School District, 790 F.2d 1471, 1483 (9th Cir.1986) (Wallace, J., dissenting) (in case involving claimed right to advertise career alternatives to military service in public high school newspapers, relevant forum should be defined as advertising space alone)
 
 
 [14]
 The majority's claim that the advertising space was nonpublic because school officials had to "respect[ ] audience maturity" is a red herring. To repeat, the district does not claim that Planned Parenthood's ad was inappropriate for high school students. Second, the majority's reliance on the district's need to "disassociat[e] itself from speech inconsistent with its educational mission" is untenable. The only "educational mission" relied upon by the district is a state statute requiring instruction in the human reproductive system, related communicable diseases, and sexual responsibility. The Planned Parenthood ad in no way interferes with this mandate. See infra Part IV. Finally, the majority's reliance on the district's need to "avoid[ ] the appearance of endorsing views" is disingenuous. The idea that readers of the district's publications will assume that a paid advertisement bears the imprimatur of the school district is preposterous. Readers are no more likely to assume that Planned Parenthood's ad bears the district's imprimatur than ads from political candidates, casinos, churches or lounges and bars
 
 
 [15]
 The district court later reconsidered and lowered its level of scrutiny to reasonableness after Hazelwood was decided
 
 
 [16]
 The school district even published an ad that was sexually suggestive. The ad displayed a teenage boy and girl, their arms wrapped around each other. The boy was bare-chested in swimming trunks and sunglasses; the girl wore a one-piece swimsuit with a plunging neckline. Across the boy's chest was the phrase: "The Hottest New Swimwear for '85!." ER 57 at 8-II. See generally Rosenberg, "It's More Fun to Sell Sex Than Protection," L.A. Times, Oct. 19, 1990 § F, at 1, col. 2 (noting proliferation of television shows emphasizing casual sex, while networks bar advertisements for prophylactics)
 
 
 [17]
 See Nev.Rev.Stat. § 389.065. The requirement was incorporated into two Clark County School District Documents, Policy 6123 and Regulation 6123. See ER 57, Defendants' Exhibit C. The statute states in part:
 
 
 [1]
 The board of trustees of a school district shall establish a course or unit of a course of:
 (a) Factual instruction concerning acquired immune deficiency syndrome; and
 (b) Instruction on the human reproductive system, related communicable diseases and sexual responsibility.
 ....
 
 
 [3]
 The subjects of the courses may be taught only by a teacher or school nurse whose qualifications have been previously approved by the board of trustees